UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 18 CR 185-1, -3 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| TOBIAS DIGGS and JOSHUA McCLELLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Tobias Diggs and Joshua McClellan were charged by indictment with several offenses arising from the March 17, 2017 robbery of Razny Jewelers in Hinsdale, Illinois. Doc. 1. A jury convicted them of all counts. Docs. 221-223. (The third defendant, Marvon Hamberlin, remains a fugitive. Docs. 89-90.) Diggs and McClellan move under Criminal Rule 29 for a judgment of acquittal or, in the alternative, under Criminal Rule 33 for a new trial. Docs. 254-256. The motions are denied.

## Background

In March 2018, a grand jury returned a four-count indictment charging Diggs and McClellan with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); Hobbs Act robbery, in violation of § 1951(a); brandishing a firearm during and in relation to a crime of violence, in violation of § 924(c)(1)(A); and transporting in interstate commerce stolen goods with a value of at least $5,000, in violation of § 2314. Doc. 1. Defendants pleaded not guilty, and the case was tried to a jury in October 2020. Docs. 208, 210-211, 216-218, 221.

The Government presented several eyewitnesses to the robbery—including the two sales associates and security guard who were working at Razny, and employees of neighboring

1

stores—who testified about the details of the robbery and the getaway, much of which was captured on surveillance video. Doc. 278 at 46-106. On March 17, 2017, shortly before 10:00 a.m., an SUV parked near Razny. *Id*. at 50, 55-56. Three masked men entered the store with guns raised. *Id*. at 52, 68, 87. Two of the men tackled and handcuffed the security guard, while the third pushed a sales associate to the ground, handcuffed her, hit her on the head several times, and pulled her by her hair to the back room. *Id*. at 50-53, 68, 78. One robber went to the basement, where the safes were located, *id*. at 57, and there discovered another sales associate, *id*. at 87. He put a gun to her head and locked her in the bathroom, threatening to kill her if she came out. *Id*. at 87-90. The robbers took jewelry and watches from a safe and display cases, placed them in large bags, and left the store through the back door into the alley. *Id*. at 98-100, 121; Gov't Exh. 1-1 at 10:00:21-10:12:33 (surveillance video). A blue or silver Lexus with Michigan plates picked them up and drove off. Doc. 278 at 121-122, 145-146. The eyewitness account and video depiction of the robbery and getaway were uncontested. *Id*. at 32.

Following the eyewitness testimony, Stephanie Herman testified as follows. Herman, the manager of the Hinsdale Razny, was not at the store on March 17 because she was on her honeymoon. *Id*. at 222, 224. She had stored her personal jewelry, including a custom-made engagement ring, in one of the store's safes. *Ibid*. Following the robbery, Herman identified a diamond ring acquired by another jewelry store—later identified by another witness as W.A. Jewelers, Doc. 279 at 190, 203-204—as her engagement ring, based on the diamond's weight, oval shape, imperfections, and inscription, and the ring's serial number, Doc. 280 at 225-227, 247-251. Herman also testified that, according to an accounting of the store's inventory before and after the robbery, over $400,000 of jewelry was stolen. *Id*. at 223, 228-233. Herman was

shown two pictures of Patek Philippe and Rolex watches, which matched the descriptions of the missing inventory. *Id*. at 235-244.

Devinn Adams—the mother of Diggs's child, Doc. 279 at 141, his girlfriend at the time of the robbery, *id*. at 58, and his wife at the time of the trial, *id*. at 30—testified pursuant to a grant of immunity, *id*. at 28-29, as follows. (As discussed below, the court overruled in part Adams's invocation of the spousal testimonial privilege. Docs. 188-189 (reported at 2020 WL 5878018 (N.D. Ill. Oct. 2, 2020)).) On March 17, Adams was visiting her parents in Michigan. Doc. 279 at 29. At that time, she was living with Diggs at his mother's house in Matteson, Illinois, a suburb south of Chicago. *Id*. at 29-30, 69. When she went to Michigan, Adams left her vehicle—a blue Lexus with Michigan license plates—in Matteson, where Diggs sometimes drove it. *Id*. at 31-33. Adams received a "frantic phone call" from Diggs on March 17 in which he told her that "the car was on the news" and asked her to return to the city to get the car "because he had busted a J move or a J spot," which Adams understood to refer to a jewelry store. *Id*. at 30-31. Adams Googled her car, as well as the search terms "jewelry store" and "Hinsdale robbery," and found several news articles about a robbery in Hinsdale. *Id*. at 34-36.

Adams then asked her stepfather, her biological father, and possibly her mother for a ride to the city so she could retrieve her car. *Id*. at 37-38. She asked her stepfather in person, *id*. at 38, and her biological father via two text messages that read: "What time ru getting off work today?" and, in reply to his response that he had just finished work, "[D]o u think you could run us back possibly?" *Id*. at 38-43; Gov't Exh. 8-6. (The second text message was admitted as a coconspirator statement under Evidence Rule 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). 2020 WL 5878018 at *3-6.) Adams did not go back to the city that

day; by way of explanation, she testified: "After I met with the investigators and everybody, I just realized what was going on and realized it wasn't a good idea." Doc. 279 at 37.

Over the next few days, Adams received calls from Diggs telling her that he was going "out of town" or "down south," which Adams interpreted to mean Atlanta, and that he had arrived at a hotel. *Id*. at 57-58, 64. Diggs told her that he was traveling with "Bro and them," who Adams identified as "Jonathan McClennan" while noting that she did not know how to pronounce his last name. *Id*. at 58-59. During those calls, Diggs used a phone number different from the numbers associated with him in Adams's phone contact list. *Id*. at 78. At one point, Adams texted the number that Diggs was using—(901) 550-1063—to his mother, who was trying to contact him. *Id*. at 50-51, 79. Adams also received a call from a man from Atlanta she knew as Gold Mouth (because of his gold teeth), who was an acquaintance of a jeweler named A.P., and who was attempting to reach Diggs; she gave Gold Mouth the 901 number that Diggs was using. *Id*. at 56-57. Adams testified that Diggs has several nicknames, including "Chief," "Bias," and "Chief Bias." *Id*. at 130.

Anastas Babakhanyan, who goes by "A.P. the Jeweler," *id*. at 154, testified as follows. On March 19, A.P. met with three to five persons who offered to sell him Rolex and Patek Philippe watches for around $100,000-$200,000. *Id*. at 161-165. The meeting occurred near a Microtel hotel in Atlanta and was set up by a man with gold teeth nicknamed "Nephew." *Id*. at 162-163. A.P. testified that he did not know who the persons were, but he knew that one of them was "one of Nephew's boys." *Id*. at 168-169, 174. A.P. took two pictures of the watches—the same pictures that Herman identified as portraying watches stolen from Razny, Doc. 278 at 235-244—but did not purchase them, Doc. 279 at 164-168.

Jessica Christian, another girlfriend of Diggs at the time of the robbery, testified as follows. *Id*. at 180. In March 2017, Diggs drove a silver or blue Lexus with Michigan plates that belonged to Adams. *Id*. at 180-181. On March 17, Diggs asked Christian if she wanted to use the Lexus. *Id*. at 182. Christian accepted, picked up the keys from Diggs, and drove the car to work. *Id*. at 182-184. When Christian left work, she called Diggs to pick him up, as they had previously agreed. *Id*. at 182, 186. Diggs did not answer his phone, so she drove straight home. *Id*. at 186. Later, when Christian asked Diggs when he was coming to pick up the car, Diggs assured her that he would get it. *Id*. at 187. Diggs never came to pick up the car, and it was eventually recovered by law enforcement. *Id*. at 186-187.

Thomas Ustupski, vice president of W.A. Jewelers, testified as follows. *Id*. at 190. On March 24, a man entered W.A. Jewelers and asked whether the store would buy diamond jewelry. *Id*. at 191-192. The man showed Ustupski a diamond ring, which Ustupski purchased for $3,000 in cash. *Id*. at 192, 201. Ustupski testified that he usually pays for jewelry in hundred-dollar bills. *Id*. at 201. The sales receipt recorded the seller's name as "Joshua McClellan" and described the ring as an engagement ring with an oval center stone. *Id*. at 196; Gov't Exh. 23. The store's surveillance video footage from that day shows a one-legged man drive up, enter the store with crutches, sell the ring, and leave. Doc. 279 at 198-203. (McClellan has only one leg.) Two to three weeks after that sale, Hinsdale police contacted Ustupski and asked if he had an oval engagement ring. *Id*. at 204. Ustupski produced the ring, and the police told him that it had been stolen. *Ibid*.

Agent Daniel Silk of the Department of Homeland Security testified as follows. Doc. 280 at 16. As part of his investigation of the robbery, Silk obtained registration records from the Microtel hotel in Atlanta indicating that Joshua McClellan had arrived on March 19 and

departed the next day. *Id*. at 28-30; Gov't Exh. 27. Silk also obtained business records from the Chief Bias Fan Page Instagram account indicating that, on March 19, Swollboychiefbias sent two messages, the first asking the recipient to "Shoot me yo line asap G," and the second stating, "Call me G 9015501063." Doc. 280 at 33-34; Gov't Exh. 28. A text message sent to Diggs's Facebook page on March 16 stated, "Call me bro 773 439 0882." Doc. 280 at 34-36; Gov't Exh. 41. Toll records from the 901 phone show that it called that 773 number less than two minutes later. Doc. 281 at 252-253; Gov't Exh. 3 at 4. The parties stipulated that the Instagram and Facebook accounts belonged to Diggs. Doc. 280 at 13. Two pictures posted on Diggs's social media accounts from June 2016 showed Diggs with A.P. the Jeweler. Doc. 279 at 169-173; Doc. 280 at 13; Gov't Exhs. 18-1, 18-2.

Agent Silk also obtained cellphone toll records displaying incoming and outgoing phone calls and text messages from McClellan's phone and from the 901 phone. Doc. 280 at 36-40; Gov't Exhs. 38, 39. Based on those and other records, Silk prepared a common call analysis showing that, from March 10-27, the 901 phone had made or received multiple calls to phone numbers associated with Diggs's mother, father, brother, and girlfriends (Adams and Christian), and McClellan and Gold Mouth. Doc. 280 at 41-46; Gov't Exh. 35. A summary of calls made from Gold Mouth's phone showed that, from March 18-21, Gold Mouth placed and received calls from the 901 phone sixteen times. Doc. 280 at 58-59; Gov't Exh. 37. On March 17 at 9:40 a.m., the 901 phone was called by another phone for a call lasted about 26 minutes, covering the period of the robbery. Doc. 280 at 46, 54-56; Gov't Exh. 59. Razny's surveillance footage depicts one of the robbers holding a cellphone. Doc. 280 at 56-57; Gov't Exh. 57.

Through Agent Silk, the Government introduced several types of data extracted from McClellan's phone. First, the contact list from the phone listed two numbers for "Bais"—the

901 number, and Adams's number—and had an entry for "Ap" created on March 19. Doc. 280 at 63-66; Gov't Exh. 9-2. Second, a timeline of McClellan's incoming and outgoing calls and text messages showed that, on January 12, 2017, a phone listed as "Johnny" in McClellan's contact list, Doc. 280 at 67; Gov't Exh. 9-2, texted McClellan to ask, "When we going to check the spots out?" Doc. 280 at 46, 68-71; Gov't Exh. 9-3 at 5. McClellan responded, "We can do that tomorrow." Doc. 280 at 71; Gov't Exh. 9-3 at 6. Several days later, McClellan texted Johnny, "U know what tomorrow a holiday idk if they open," and later that day, McClellan texted Johnny, "We gotta go a nice distance." Doc. 280 at 72; Gov't Exh. 9-3 at 7-8. On January 20, McClellan texted Johnny to "[s]et [his] clock for 7 real shit don't forget," and the next day, McClellan texted Johnny at 7:07 a.m. saying, "I'm down here." Doc. 280 at 73; Gov't Exh. 9-3 at 9-10. Shortly before 11:00 a.m. that day, McClellan texted a contact named James, saying, "Hit my line bro I got something super sweet for us on some big money shit." Doc. 280 at 73-74; Gov't Exh. 9-3 at 11.

The next day, January 22, McClellan texted Johnny, "I'm bout to let them know." Doc. 280 at 74-75; Gov't Exh. 9-3 at 13. Johnny responded, "Aite i talk to bias he supposed to be getting down," and McClellan texted back, "Aite bet I'm hittin James up now." Doc. 280 at 75; Gov't Exh. 9-3 at 13. McClellan then texted James, "I'm gonna come get you in the morning so we can run through the plan." Doc. 280 at 76; Gov't Exh. 9-3 at 13. A week later, on January 29, McClellan texted Johnny, "Did u let bias know we good on dat?," and Johnny responded, "I talked to him earlier but i aint let him know yet. Ima tell him when he come this way tonight." Doc. 280 at 77; Gov't Exh. 9-3 at 15. On February 1, Johnny texted McClellan, "Naw he was saying we aint prepared." Doc. 280 at 78; Gov't Exh. 9-3 at 16. Later that day, McClellan texted Johnny, "Let's go take sumthin." Doc. 280 at 78; Gov't Exh. 9-3 at 17.

On March 17, between 6:59 a.m. and 8:47 a.m., McClellan placed or received ten calls from Johnny and the 901 phone. Doc. 280 at 97-100; Gov't Exh. 9-5 at 4-5. Those included a text to Johnny, "Bet. He on his way,"; an instant message saying, "U up bro?"; and a text to Johnny saying, "We on our way." Doc. 280 at 98-99; Gov't Exh. 9-5 at 5. On March 18, just after 10 p.m., McClellan texted Johnny, "We gone gone move out in a couple hours." Doc. 280 at 103; Gov't Exh. 9-5 at 11. After calling McClellan, Johnny texted him, "its AP the jeweler look him up." Doc. 280 at 104; Gov't Exh. 9-5 at 11. At 11:33 p.m., Johnny texted, "if we don't leave tonight then we wont cashout till Monday," and McClellan replied, "We leaving for show tonight." Doc. 280 at 106; Gov't Exh. 9-5 at 12. About an hour later, at 12:39 a.m. on March 19, McClellan texted Johnny that he was "[e]n route"; at 1:53 p.m. that day, McClellan texted, "We here, bro." Doc. 280 at 108-109; Gov't Exh. 9-5 at 12, 14. At 10:21 p.m., McClellan texted a contact named Kanaris to say that "shit ain't looking good[.] I met the n[***] Ap and I been waiting on him the last 5 hours." Doc. 280 at 115; Gov't Exh. 9-5 at 17. Kanaris later text McClellan, "Mfs was looking forward to that cash that was gone put you and me Wea we needed to be," and McClellan responded, "That's what I told em." Doc. 280 at 119-120; Gov't Exh. 9-5 at 20. All those text messages were deleted by the user before the phone was handed over to law enforcement. Doc. 280 at 69-121.

On March 23, McClellan called the phone number of W.A. Jewelers, listed in his phone as "J Spot On Ridge." Doc. 279 at 191; Doc. 280 at 127; Gov't Exh. 9-5 at 27. Twelve minutes later, McClellan texted Johnny, "[B]ro I need that ring." Doc. 280 at 128; Gov't Exh. 9-5 at 27. A photo from McClellan's phone, created on March 24, shows McClellan with $100 bills spread on his leg. Doc. 280 at 129-130; Gov't Exhs. 9-6, 9-7.

On cross-examination by Diggs's counsel, Agent Silk testified that he started investigating the robbery after receiving information from a confidential informant named Jerry Limage, who was friends with a man named Jerry Francis.  Doc. 280 at 179.  Silk testified that a lockbox holding the guns used in the robbery and some of the stolen jewelry was found on the South Side of Chicago, and that fingerprints on the lockbox matched those of an individual named Marcus Jones.  *Id*. at 182, 185.  On cross-examination by McClellan's counsel, Silk testified that Francis, while with Diggs, Face-Timed Limage offering to sell him jewelry from the Razny robbery.  *Id*. at 246.

FBI Special Agent Joseph Raschke testified as follows.  Doc. 281 at 35.  Using call detail records, Raschke plotted the cell tower locations with which the 901 phone and McClellan's phone connected from February to April 2017.  *Id*. at 58-61.  Cellphones connect to the cell tower in their network with the strongest, clearest signal, which is usually, but not always, the closest tower.  *Id*. at 47.  Raschke's analysis showed that, on March 17, the 901 phone connected to a tower just north of Diggs's address at 6:57 a.m., 7:00 a.m., and 7:10 a.m.  Doc. 280 at 131; Doc. 281 at 64-65; Gov't Exh. 19; Gov't Exh. 62 at 1.  At 9:40 a.m., the 901 phone connected to a tower 1.48 miles from Razny for a 25-minute call.  Doc. 281 at 72; Gov't Exh. 62 at 2.  Between 2:02 p.m. and 3:59 p.m., the 901 phone contacted Adams's number seven times.  Doc. 281 at 78; Gov't Exh. 62 at 3.  On March 19, beginning around midnight, the 901 phone connected to various towers in Chicago, Indiana, Kentucky, Tennessee, and Georgia, indicating that it had traveled from Chicago to Atlanta, arriving in Atlanta by early afternoon.  Doc. 281 at 79-81; Gov't Exh. 62 at 5.  In the early morning hours of March 20, the 901 phone traveled back from Atlanta to Chicago, arriving in Chicago by 10:18 a.m. on March 20.  Doc. 281 at 81; Gov't Exh. 62 at 6.  The phone was in Atlanta for about nine hours.  Doc. 281 at 83.

On March 17, McClellan's phone connected to a tower in Hinsdale at 9:47 a.m. Doc. 281 at 95; Gov't Exh. 62 at 13. By 10:22 a.m., the phone started traveling east. Doc. 281 at 95; Gov't Exh. 62 at 13. On March 19, the phone traveled to Atlanta, and it returned to Chicago by 10:00 a.m. on March 20. Doc. 281 at 97; Gov't Exh. 96 at 15-16. While in Atlanta, both McClellan's phone and the 901 phone connected to a tower "very near" the Microtel. Doc. 281 at 98; Gov't Exh. 62 at 17.

Neither Diggs nor McClellan presented evidence, and the jury received the case following closing arguments and instructions. Doc. 281 at 205; Doc. 282 at 99-103. The jury returned a guilty verdict on all counts. Docs. 222-223. Other facts pertinent to Defendants' motions are set forth below.

## Discussion

### I.  Rule 33 Motions

Rule 33(a) provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The Rule does not define 'interests of justice' and the courts have had little success in trying to generalize its meaning. Nevertheless, courts have interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). That said, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). "A defendant is entitled to a new trial only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016).

### A.     Diggs's Motion

Diggs argues that the court erred in overruling Adams's invocation of the spousal testimonial privilege, in allowing Adams to read into evidence her text to his mother relaying the 901 phone number that he was using, in failing to strike Agent Silk's testimony regarding Limage's out-of-court statement placing Diggs with Francis at the time Francis was attempting to sell Limage some of the stolen jewelry, and in excluding a hearsay statement from Earl Kemp that he had been asked to pawn some of the stolen jewelry. Doc. 254. Diggs also argues that the Government made improper remarks during its closing arguments. *Ibid*. Diggs contends that there is a reasonably probability that the "admission of this evidence and these arguments" had a prejudicial effect on the jury's verdict, warranting a new trial. *Id*. at 2.

### 1.     Adams's Out-of-Court Statement and Testimony

Before trial, the Government moved under *Santiago* to admit certain coconspirator statements of Johnny, James, Kanaris, Christian, and Adams under Rule 801(d)(2)(E). Doc. 145. Diggs opposed the motion only as to Adams's statements. Doc. 154 at 1. Based on the Government's proffered evidence, the court held that Adams was Diggs's coconspirator and admitted one of her statements—the text message asking her father, "do u think you could run us back possibly?"—under Rule 801(d)(2)(E). 2020 WL 5878018 at *3-6. The court found that Adams's other statements were not hearsay and thus did not need to be admitted under Rule 801(d)(2)(E). *Id*. at *4-5. The more consequential issue was whether the joint participants exception to the spousal testimonial privilege defeated Adams's invocation of the privilege. *Id*. at *7. Based on the Government's proffered evidence, the court held that Adams became a joint participant in the robbery as of March 17, when she made efforts to assist Diggs in concealing the getaway car and obtaining a rental car to take to Atlanta, through March 23, when she confessed to the authorities. *Ibid*. Accordingly, the court held that the spousal testimonial

privilege—which otherwise would have shielded Adams from being compelled to testify against Diggs—was overcome regarding the events to which she was a percipient witness from March 17-23. *Id*. at \*7-8.

Diggs contends that the Government did not present at trial evidence sufficient to substantiate its *Santiago* proffer that Adams was a coconspirator and joint participant. Accordingly, Diggs asserts, Adams's out-of-court statement should not have been admitted under Rule 801(d)(2)(E) and the court should not have overruled her invocation of the spousal testimonial privilege. Doc. 254 at 5-9; Doc. 269 at 4-8. Diggs adds that even if the joint participants exception to the spousal testimonial privilege applied, Adams should not have been compelled to testify about their March 17 "J spot" phone call because, being unaware of the robbery at that point, she could not have been a joint participant. Doc. 254 at 9-14; Doc. 269 at 3. The Government maintains that "[t]he evidence admitted at trial was the exact evidence outlined in the government's *Santiago* proffer," that Adams's out-of-court statement was properly admitted under Rule 801(d)(2)(E), and that she was properly compelled to testify under the joint participants exception to the spousal testimonial privilege. Doc. 268 at 19-23.

> **a.   Whether Adams Was a Coconspirator Under Rule 801(d)(2)(E) and a Joint Participant for Purposes of the Spousal Testimonial Privilege**

The Government's *Santiago* proffer included evidence that, within ten minutes of Diggs telling Adams on March 17 that he had just "hit a j-spot" and needed her to return to the city to pick up the Lexus, Adams began a text chain with her stepfather asking for a ride back to the city, and that Adams exchanged multiple calls with Diggs shortly after those texts. Doc. 145 at 23; Doc. 163 at 7. The Government also proffered evidence that, a half hour after receiving a call from Diggs on March 18, Adams searched online for rental car reservations, placed two calls to Budget car rental, and called Diggs almost immediately after her second call to Budget.

12

Doc. 145 at 24; Doc. 163 at 8.  In addition, the Government proffered evidence that, when Adams met with the Hinsdale police on March 23, she pretended not to know about the robbery and claimed that the Lexus had been "broken" since before the robbery.  Doc. 163 at 4-5.  The court held that the proffered evidence showed that Adams was a coconspirator for purposes of Rule 801(d)(2)(E), as well as a joint participant for purposes of defeating the spousal testimonial privilege, given her efforts to assist Diggs in concealing the Lexus and in finding a rental car for him to travel to Atlanta to sell the stolen jewelry.  2020 WL 5878018 at *5-7.  Accordingly, the court ruled that Adams could not invoke the spousal testimonial privilege regarding events to which she was a percipient witness from March 17-23, the time frame during which she was a joint participant, and that her out-of-court text message asking her stepfather for a ride back to the city was a non-hearsay statement made in furtherance of the conspiracy.  *Id*. at *6-8.

Diggs argues that the court's ruling relied on two aspects of the *Santiago* proffer that the Government did not introduce at trial: first, that Adams "took affirmative steps to rent a car for Diggs and his co-defendants by calling the rental car company"; and second, that she "lied to law enforcement by telling them that her car was broken and in for repair at the time of the robbery."  Doc. 254 at 5-6; Doc. 269 at 4.  According to Diggs, the evidence at trial was insufficient to substantiate the court's pretrial (and thus provisional) ruling that Adams was a coconspirator and joint participant.  Doc. 254 at 6-9; Doc. 269 at 8.  The Government responds that the evidence introduced at trial amply supported the court's pretrial ruling.  Doc. 268 at 19-23.

There is no requirement that the evidence at trial correspond perfectly with a *Santiago* proffer.  To the contrary, if "the government's evidence does not fulfill its *Santiago* proffer in key respects … the evidence actually offered at trial [can still] satisf[y] the government's burden under Rule 801(d)(2)(E)."  *United States v. Davis*, 845 F.3d 282, 287-89 (7th Cir. 2016); *see also*

*United States v. Andrus*, 775 F.2d 825, 836-37 (7th Cir. 1985) ("The ultimate finding of a statement made in furtherance of a conspiracy for purposes of rule 801(d)(2)(E) must be based on all the evidence admitted at trial."). Thus, although the *Santiago* proffer included evidence not introduced at trial, the key question is whether the evidence at trial showed that Adams was a coconspirator and joint participant. The evidence showed precisely that.

For starters, the evidence at trial that Adams made efforts to return to the city to retrieve the Lexus corresponded exactly with the Government's *Santiago* proffer on that point (with the exception that the Government made the immaterial mistake of identifying the recipient of Adams's text messages as her stepfather, when it was in fact her father). Adams testified that, following the "J spot" call in which Diggs asked her to retrieve the Lexus, she asked her father, her stepfather, and possibly her mother for a ride to the city. Doc. 279 at 30-31, 37-38. In addition, Adams's March 17 text messages with her father and her call records from March 10-23, which were admitted into evidence, show that she asked her father for a ride to the city nine minutes after the "J spot" call, and that Adams called Diggs several times shortly after she exchanged texts with her father. *Id*. at 39-44, 54; Gov't Exhs. 8-5, 8-6. As explained in the court's pretrial ruling, that evidence shows that Adams agreed to help Diggs conceal the Lexus and took steps to follow through. 2020 WL 5878018 at *5. As a "main criminal objective[] of the conspiracy"—selling the stolen jewelry—was still ongoing, Adams's agreement to conceal evidence of the robbery demonstrates that she was a coconspirator and joint participant in the robbery. *Grunewald v. United States*, 353 U.S. 391, 405 (1957).

Diggs argues that Adams's testimony that she ultimately did not return to the city because she "didn't want to be involved" established that she "abstain[ed] from joining the conspiracy." Doc. 254 at 8. But Adams explained that she did not return because, "*[a]fter I met with the*

*investigators and everybody*, I just realized what was going on and realized it wasn't a good idea." Doc. 279 at 37 (emphasis added). Adams did not meet with investigators until March 23. *Id*. at 74-75. And as her calls and text messages indicate, she was involved in attempting to conceal the Lexus on March 17. Thus, her trial testimony does not establish that she abstained from joining the conspiracy on March 17.

Diggs is correct that the trial evidence did not conclusively establish that Adams called Budget car rental. Nonetheless, the evidence at trial proved that Adams agreed to help secure a rental car for Diggs and the others to drive to Atlanta to sell the stolen jewelry and that she took steps to accomplish that goal. Adams testified that Diggs informed her that he was going "down south," which Adams interpreted to mean Atlanta. *Id*. at 57-58. Adams's call and web search history records, admitted into evidence, *id*. at 36, 54, revealed that, about thirty minutes after placing two calls to Diggs on March 18, she began web searches on her phone for "no credit card car rental," Budget car rental reservations, and "south bend regional airport budget car rental." Gov't Exh. 8-4 at 2-4; Gov't Exh. 8-5 at 6. In addition, less than twenty seconds after searching for "budget car rental phone," Adams placed an almost five-minute call to a 1-800 number, and some five minutes after that call ended, Adams called Diggs. Gov't Exh. 8-5 at 6. Less than fifteen minutes later, McClellan texted Johnny that "everything good wit[h] the whip"—Agent Silk testified that "whip" refers to a car, Doc. 280 at 103-104—and McClellan texted that he was "[e]n route" to Atlanta about two hours later, Gov't Exh. 9-5 at 11-12.

True enough, some of McClellan's other text messages indicate that he borrowed Kanaris's car to drive to Atlanta. Gov't Exh. 9-5 at 15-21. Still, Adams's search for "budget car rental phone" and follow-up call to a 1-800 number suggest that she called Budget, and the close connection between her conversations with Diggs, her car rental searches, and McClellan's text

15

messages confirming that they had secured a car to drive to Atlanta demonstrate that she was attempting to help Diggs find a car to drive to Atlanta.

That the Government did not introduce evidence that Adams told the police that the Lexus was broken at the time of the robbery does not change the analysis. As explained above, other evidence introduced at trial showed that Adams conspired with Diggs to conceal the Lexus and to find Diggs a car to take the stolen jewelry to Atlanta. In addition, although the Government did not introduce evidence about Adams's lie that the Lexus was broken, she did testify that she initially lied to the police by denying that she knew anything about the robbery. Doc. 279 at 119, 132-133. In sum, the minor deviations between the Government's *Santiago* proffer and the evidence introduced at trial do not undermine the court's pretrial ruling that Adams was a coconspirator and joint participant in the robbery.

> **b. Whether the Joint Participants Exception to the Spousal Testimonial Privilege Extends to the "J Spot" Call**

In an oral ruling before trial, the court held that the joint participants exception to the spousal testimonial privilege encompassed the March 17 "J spot" call in which Diggs asked Adams to return to the city to get the Lexus "because he had busted a J move or a J spot." Doc. 278 at 4-10; Doc. 279 at 30-31. Diggs argued then and repeats now that the joint participants exception does not extend to that conversation because Adams "could not yet have been a joint participant" when he first informed her of the robbery. Doc. 254 at 9-14. The Government responds by endorsing the court's ruling, Doc. 278 at 4-10, that an initial conversation that both informs the spouse of the crime and successfully solicits her participation falls within the joint participants exception, Doc. 268 at 23.

The spousal testimonial privilege provides that a witness cannot be compelled to testify against the person to whom she is married at the time of trial. *See United States v. Byrd*, 750

F.2d 585, 590 (7th Cir. 1984).  The joint participants exception precludes a witness-spouse from invoking the privilege where the spouse and the defendant jointly participated in the criminal conduct at issue.  *See United States v. Van Drunen*, 501 F.2d 1393, 1397 (7th Cir. 1974).  The spousal testimonial privilege is distinct from the marital communications privilege, which "covers information privately disclosed between husband and wife in the confidence of the marital relationship."  *United States v. Brock*, 724 F.3d 817, 820 (7th Cir. 2013) (internal quotation marks omitted).  There is also a joint participants exception to the marital communications privilege, under which "any confidential statements concerning a joint criminal enterprise are not protected by the privilege."  *United States v. Westmoreland*, 312 F.3d 302, 307 (7th Cir. 2002).  The marital communications privilege does not apply here because Adams and Diggs were not married in March 2017.  Doc. 279 at 58.

As the court explained in its oral pretrial ruling, the Seventh Circuit has not addressed whether the joint participants exception to the spousal testimonial privilege encompasses statements to a spouse that *both* describe past criminal conduct *and* successfully solicit the spouse's participation.  However, in the context of the joint participants exception to the marital communications privilege, the Seventh Circuit has distinguished between communications that merely inform a spouse of criminal activity—which do not fall within the exception—and those that successfully solicit the spouse's cooperation—which do.  In *Westmoreland*, the defendant informed his wife of his participation in a murder; later, she became an accessory after-the-fact by destroying evidence.  312 F.3d at 306-07.  The Seventh Circuit held that the husband's mere disclosure of his criminal activity was privileged, reasoning that the joint participants exception to the marital communications privilege does not extend to the "initial disclosure of a crime to one's spouse, without more," even if the spouse "later joins the conspiracy."  *Id*. at 308.

17

In so holding, *Westmoreland* "emphasize[d]" that it did not address the "situation faced by the … Fourth Circuit in *United States v. Parker*, 834 F.2d 408 (4th Cir. 1987)," in which "the initial discussion of the past criminal endeavor is part of the solicitation and agreement of the spouse to participate in the cover-up." *Westmoreland*, 312 F.3d at 308-09. *Westmoreland* quoted approvingly from *Parker*, which held that "the marital communications privilege did not apply to 'statements made in the course of successfully formulating and commencing joint participation in criminal activity.'" *Ibid.* (quoting *Parker*, 834 F.2d at 413). *Westmoreland* observed that *Parker* rested on the principle that, "[w]hen the initial discussion of the past criminal endeavor is part of the solicitation and agreement of the spouse to participate in the cover-up … the policy concerns that implicate the joint criminal participation exception"—*i.e.*, that the privilege should not allow a criminal to "enlist the aid of his spouse in a criminal enterprise without fear that by recruiting an accomplice or co-conspirator he is creating another potential witness," *Parker*, 834 F.2d at 413 (quoting *Van Drunen*, 501 F.2d at 1396)—"are as much implicated as in later communications made during the criminal activity." *Westmoreland*, 312 F.3d at 309.

Diggs's informing Adams of his participation in the robbery and asking her to retrieve the Lexus—a request on which she acted nine minutes later by texting her father for a ride to the city—easily qualifies as an "initial discussion of the past criminal endeavor [that] is part of the solicitation and agreement of the spouse to participate in the cover-up." *Ibid.* (paraphrasing *Parker*, 834 F.2d at 413). Thus, under *Parker*, the "J spot" call would have fallen within the joint participants exception to the marital communications privilege had Diggs and Adams been married at the time of the call. *See Parker*, 834 F.2d at 413. There is no plausible basis to reach a different result under the spousal testimonial privilege. Accordingly, because *Westmoreland*

18

suggests that the Seventh Circuit agrees with *Parker*, and because *Parker*'s reasoning—that the marital privileges should not be applied to communications in which a defendant successfully recruits their spouse in a criminal endeavor—is persuasive, *Parker* applies, and Adams was correctly compelled to testify about the "J spot" call.

Pressing the opposite result, Diggs attempts to distinguish the two privileges, arguing that *Parker* does not apply here because it addressed the marital communications privilege, which "seeks to protect and promote confidential communications made between spouses, and is thus focused on the nature of the communications themselves," and not the spousal testimonial privilege, which "is forward-looking and seeks to protect the marriage from the future effect that forcing one spouse to testify against the other would have on the marriage." Doc. 254 at 10-11. According to Diggs, this court erred by "focus[ing] on the nature and purpose of the marital communication at issue" instead of "evaluat[ing] the future impact on [Diggs and Adams's] marriage that would result from applying the exception to that initial conversation." *Id*. at 12-13.

That argument fails to persuade. Contrary to Diggs's submission that the two privileges "serve different purposes," and therefore that cases (like *Parker* and *Westmoreland*) addressing the marital communications privilege cannot inform disputes over the scope of the spousal testimonial privilege, *id*. at 10-13, the Seventh Circuit in *Van Drunen* held that the "underlying reason for both privileges" is the same: "to preserve the family." *Van Drunen*, 501 F.2d at 1396 (internal quotation marks omitted). *Van Drunen* added that, for purposes of both privileges, the "public interest in preserving the family … does not justify assuring a criminal that he can enlist the aid of his spouse in a criminal enterprise without fear that by recruiting an accomplice or coconspirator he is creating another potential witness." *Ibid*. It therefore does not surprise that *Van Drunen* applied a marital communications precedent to help resolve the spousal testimonial

privilege question it was considering. *Ibid*. Accordingly, this court properly relied on marital communications cases (*Westmoreland* and *Parker*) to resolve the spousal testimonial privilege question presented here.

### 2. Admission of Adams's Text Message to Diggs's Mother Relaying Diggs's 901 Number

During the Government's direct examination of Adams, the court held that Evidence Rule 803(5) allowed her to read into the record the 901 phone number that she texted to Diggs's mother on March 17. Doc. 279 at 51-53. Rule 803(5) allows a record to be read into evidence if it: "(A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge." Fed. R. Evid. 803(5). Diggs contends that the Government failed to establish element (C)—that Adams's text message accurately reflected her knowledge that Diggs was using that particular number. Doc. 254 at 15-17. The Government retorts that it established all the Rule's requirements and that, even if the court erred, the error did not prejudice Diggs, as there was ample other evidence linking Diggs to the 901 number. Doc. 268 at 23-25.

Adams testified at trial that she could not currently recall the 901 number, but that the number was fresh in her mind when she wrote the text message. Doc. 279 at 45-46. As to the accuracy of the phone number, Adams testified as follows:

Q: Ma'am, did you communicate with Mr. Diggs on that number at that time?

A: I believe so, yes.

Q: And how did you know to give that number to his mother as his number?

A: If it was the number that he was contacting me on. She asked for the number. That was the number I gave.

*Id*. at 51.  Diggs argues that Adams's answers to both questions were "equivocal and conditional."  Doc. 254 at 16.  The Government argues that "the only correct reading of the testimony" is that the text message reflected "the number … from which Diggs was calling her," reasoning that Adams responded "yes" to the question of whether she communicated with Diggs on that number.  Doc. 268 at 24.

The Government is correct that Adams's answer, "I believe so, yes," affirms that she communicated with Diggs on the 901 number.  Doc. 279 at 51.  Although she began her answer with the equivocal "I believe so," she finished her response with an affirmative "yes."  *Ibid*.  That answer conveys that the text message relaying the 901 number was accurate because it was indeed the one from which Diggs was communicating with her.  And although Adams began her next response with "if," the last two sentences of her answer—"She asked for the number.  That was the number I gave."—are unequivocal and show that Adams gave Diggs's mother the number on which Diggs was contacting her.  *Ibid*.

Even if Adams's testimony failed to satisfy Rule 803(5), the court's error was harmless, as other evidence independently and convincingly established that the 901 number belonged to Diggs.  *See United States v. Johnson*, 127 F.3d 625, 631 (7th Cir. 1997) ("Because of its limited (or nonexistent) prejudicial effect on the defendant, the admission of hearsay by the trial court constitutes harmless error when it is cumulative to other testimony already presented.").  First, a message sent by "Swollboychiefbias" on March 19 from the Chief Bias Fan Page Instagram account—an account belonging to Diggs, Doc. 280 at 13, whose nickname was "Chief Bias," Doc. 279 at 130—stated, "Call me G 9015501063."  Doc. 280 at 33-34; Gov't Exh. 28.  Second, a common call analysis shows that from March 10-27, the 901 phone made or received multiple calls to Diggs's mother, father, brother, and girlfriends, as well as to McClellan and Gold Mouth.

Doc. 280 at 41-46; Gov't Exh. 35. Third, the contact list from McClellan's phone listed two numbers for a contact labeled "Bais"—the 901 number, and Adams's number. Doc. 280 at 66; Gov't Exh. 9-2 at 4. That evidence directly and independently shows that the 901 number belonged to Diggs. Other evidence, including cell site location data showing that the 901 phone connected most frequently to a cellphone tower just north of Diggs's house, Doc. 281 at 65-66, and the fact that Gold Mouth called the 901 number three minutes after calling Adams for Diggs's number, Doc. 279 at 56-57; Gov't Exh. 3 at 7; Gov't Exh. 8-5 at 7, further supports that conclusion. Thus, even if Adams's test message to Diggs's mother was erroneously admitted under Rule 803(5), the error was harmless. *See United States v. Frazier*, 213 F.3d 409, 415 (7th Cir. 2000) (holding that the defendants "were not prejudiced by the court's error" in admitting certain hearsay because, "[b]eyond the hearsay, there was more than ample evidence in the record to support the convictions of [the defendants], and thus its admission was harmless"); *Johnson*, 127 F.3d at 631 (holding that the erroneous admission of hearsay that is "cumulative to other testimony already presented" was harmless because of its "limited (or nonexistent) prejudicial effect on the defendant"); *United States v. Carter*, 720 F.2d 941, 948 (7th Cir. 1983) (holding that the erroneous admission of hearsay was "harmless error due to the cumulative nature of the testimony").

### 3.     Admission of Limage's Out-of-Court Statement that "Jerry Francis was with Tobias Diggs"

Diggs challenges Agent Silk's testimony that Limage, his confidential informant, told him that Francis, while with Diggs, called Limage via FaceTime offering to sell proceeds from the robbery. Doc. 254 at 17-21. Diggs argues that Silk's testimony about Limage's out-of-court statement was inadmissible hearsay and violated the Confrontation Clause, and contends that its admission was "highly prejudicial" because it was "the only evidence connecting [Diggs] with

the stolen jewelry." *Ibid.*; Doc. 269 at 8-10. The Government argues that the statement's

admission was harmless, as it was never mentioned again at trial. Doc. 268 at 25-26.

During cross-examination of Agent Silk, Diggs elicited substantial hearsay testimony

about Francis's close relationship to Limage, including testimony that they were roommates and

were both from Haiti, as well as information that Limage had engaged in fraud. Doc. 280 at

179-181. Earlier in the trial, Diggs elicited hearsay testimony from Adams that Francis knew

and had travelled to meet A.P, Doc. 279 at 86, and spent significant time showing her Francis's

Facebook page and establishing that they were friends, *id*. at 83-90, 111-113. Following Diggs's

cross-examination of Silk, McClellan elicited the following testimony:

> Q. Your investigation developed specific evidence that the day after the
> robbery, Jerry Francis was trying to sell proceeds from the robbery; is that
> true?
>
> A. Jerry Francis -- there was a phone call that Jerry Francis was with Tobias
> Diggs to my informant [Limage].

Doc. 280 at 246. The colloquy continued:

> Q. Well, specifically, though, Jerry Francis Face-Timed your CI [Limage]
> with a bag of jewelry –
>
> A. Correct.
>
> Q. – that he stated was from the Razny robbery; is that true?
>
> A. Yes.
>
> Q. And he was offering your CI – he was offering – Jerry Francis was offering
> for sale the jewelry from the Razny robbery to your confidential informant; is
> that correct?
>
> A. It was, yeah, Jerry Francis.
>
> Q. Jerry Francis was trying to –
>
> A. There was other people on that call, yes.
>
> Q. Jerry Francis was trying to sell specifically a Rolex watch to your CI; is
> that correct?

A. Correct.

Q. And Jerry Francis told the CI that it was from the robbery; is that correct?

A. Correct.

*Ibid.* Diggs did not object during McClellan's cross-examination of Silk. *Id.* at 239-250. When the cross-examination ended, Diggs moved for a mistrial or, in the alternative, a curative instruction striking Silk's answer that "there was a phone call that Jerry Francis was with Tobias Diggs to my informant" and instructing the jury to disregard any reference to Diggs elicited in the cross-examination. *Id.* at 250-251.

The court held that Diggs had forfeited his hearsay and Confrontation Clause objections to Silk's testimony regarding Limage's out-of-court statement, offering two reasons: first, he had "opened the door to the hearsay testimony from Agent Silk" by developing his theory of pinning the robbery on others "substantially through hearsay" testimony, and by acquiescing in the hearsay testimony elicited by McClellan so long as it did not implicate Diggs; and second, he had not objected to the question, which could have been answered only with hearsay. Doc. 281 at 190-203. The court detailed over a dozen instances in which Diggs had elicited hearsay testimony from Adams and Silk concerning other individuals, such as Francis and Jones, who had attempted to pawn the stolen jewelry. *Id.* at 192-198. The court further noted that, following Diggs's cross-examination of Silk, McClellan's cross-examination similarly focused on hearsay inculpating individuals other than Diggs and McClellan, to which Diggs did not object. *Id.* at 198-200.

Diggs argues that the court "erred in admitting plainly inadmissible hearsay statements simply because other collateral or even related hearsay statements had, without objection from the government, previously been admitted," and submits that the "opening the door" doctrine is "only appropriate 'to neutralize or cure any prejudice incurred from the introduction of the

evidence.'"  Doc. 254 at 19 (quoting *United States v. Martinez*, 988 F.2d 685, 702 (7th Cir. 1993)).  But the Seventh Circuit "ha[s] held on a number of occasions that a defendant cannot 'open the door' to a line of testimony and then object to its admissibility when the testimony elicited is damaging."  *United States v. Brendia*, 2000 WL 1716433, at *2 (7th Cir. 2000) (cited in *United States v. Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017)); *see also Carter*, 720 F.2d at 948 ("A party cannot be permitted on one hand to introduce evidence which appears favorable and then complain, after the circumstances are fully developed, because that evidence becomes detrimental to his cause.").  That principle applies here.

Although McClellan elicited Silk's testimony that "Jerry Francis was with Tobias Diggs" while on a call during which Francis offered to sell Limage one of the stolen Razny watches, Diggs actively participated in developing a theory implicating Francis in the robbery by eliciting hearsay testimony to that effect from both Adams and Silk.  Indeed, Diggs elicited hearsay testimony from Silk concerning information that Silk had obtained from Limage about Francis— the very kind of hearsay to which Diggs now objects.  Doc. 280 at 179-181 (eliciting testimony from Silk that Limage and Francis were friends, lived together, and were both from Haiti, and that Francis called himself the "Haitian Gangster"—testimony that could have rested only on Limage's out-of-court statements to Silk).  Moreover, Diggs's counsel failed to object to Silk's hearsay testimony about the Limage-Francis call until McClellan had completed his cross-examination.  Doc. 280 at 250.  Diggs's failure to timely object is particularly problematic because much of the hearsay's prejudicial effect—the fact that Francis had a bag of stolen jewelry, and the details of his attempts to sell some of it to Limage—was developed only after Silk mentioned Diggs.  *Id*. at 246.  A timely objection could have prevented much of the prejudice of which Diggs now complains.  *Cf. Brendia*, 2000 WL 1716433, at *2 (holding that, if

defense counsel "felt that [the challenged statement] was inadmissible, she should not have opened the door by asking" about it, "much less pursued her line of questioning after eliciting the unfavorable opinion"). Because Diggs "introduce[d] evidence which appear[ed] favorable"—Silk's testimony, which rested on Limage's out-of-court statements to Silk, concerning Francis's involvement in pawning the stolen jewelry—"and then complain[ed], after the circumstances [were] fully developed, because that evidence bec[a]me[] detrimental to his cause"—by implicating Diggs—the court did not err in finding that he had "opened the door" to the statement. *Carter*, 720 F.2d at 948.

Diggs contends that he should not be penalized for his failure to object to McClellan's question because the court's assumption that the question "call[ed] for an answer that could rest solely on hearsay" was unfounded. Doc. 254 at 20. Diggs posits that Agent Silk could have "plainly and simply [answered] 'yes'" to the question, "Your investigation developed specific evidence that the day after the robbery, Jerry Francis was trying to sell proceeds from the robbery; is that true?," and argues that "counsel had no reason to expect that a professional law enforcement witness … would voluntarily and improperly inject inadmissible and non-responsive hearsay that was extraordinarily prejudicial to [Diggs]." *Ibid*. But even if Silk had answered only "Yes," the answer would still have rested on hearsay—Limage's out-of-court statement to Silk that Francis had offered to sell Limage the stolen jewelry—to which Diggs's counsel should have known to object. Notably, Diggs's argument implicitly concedes that he would not be complaining if Silk's hearsay did *not* implicate Diggs, further supporting application of the principle that "[a] party cannot be permitted on one hand to introduce evidence which appears favorable and then complain, after the circumstances are fully developed, because that evidence becomes detrimental to his cause." *Carter*, 720 F.2d at 948.

26

Diggs argues that Silk's answer could have had a non-hearsay basis if it had been based on a picture of the stolen jewelry sent by Francis to Limage. However, for Silk to have answered the question, he still would have had to rely on Limage's out-of-court statement that the jewelry in the pictures had been obtained in the robbery. Moreover, even if there had been a possible non-hearsay answer to McClellan's question, Diggs could have objected once the answer was given. Instead, he waited until the end of McClellan's cross-examination, after Silk detailed what Limage had told him had happened on the call, to raise an objection. Doc. 280 at 246-250. Thus, the court did not err in concluding that Diggs's counsel could have known to object to the hearsay before or immediately after it was uttered.

Second, Diggs argues that a new trial is required because Silk's testimony violated his Confrontation Clause rights. Doc. 290. Diggs submits that the Supreme Court's decision earlier this year in *Hemphill v. New York*, 142 S. Ct. 681 (2022), makes clear that a defendant's opening the door to certain evidence cannot defeat the defendant's objection to that evidence on Confrontation Clause grounds. The Government responds that Diggs "waived his Confrontation Clause rights by not objecting at the time of the question and … through his cross examination of [Silk] by seeking to introduce hearsay learned from [Limage]," and emphasizes that any error in admitting the statement was harmless due to the "overwhelming proof" of Diggs's participation in the robbery. Doc. 302 at 8-9, 11-15.

In *Hemphill*, the Supreme Court invalidated under the Confrontation Clause a state law providing that "a criminal defendant could 'open the door' to evidence that would otherwise be inadmissible under the Confrontation Clause if the evidence was reasonably necessary to correct a misleading impression made by the defense's evidence or argument." 142 S. Ct. at 688, 694 (internal quotation marks and alterations omitted). The Court explained that the state law

27

required the trial court to determine whether the defendant's evidence or argument was misleading and needed correction by more reliable hearsay evidence—a determination that runs afoul of the principle that hearsay violating the Confrontation Clause cannot be admitted based on a "'mere judicial determination' regarding the reliability of evidence." *Id*. at 691-92 (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004)). In response to the argument that the state law was necessary to "prevent[] the selective and misleading introduction of evidence," the Court explained that it "has not allowed such considerations to override the rights the Constitution confers upon criminal defendants." *Id*. at 692. Accordingly, the Court held that there is "no [Confrontation Clause] exception for cases in which the trial judge believes unconfronted testimonial hearsay might be reasonably necessary to correct a misleading impression." *Id*. at 693.

The hearsay here—Limage's out-of-court statement to Silk that "Jerry Francis was with Tobias Diggs" when Francis called Limage and offered to sell him jewelry stolen during the robbery—is testimonial for Confrontation Clause purposes. A statement given by a confidential informant to law enforcement is the very definition of a statement whose "primary purpose … is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see also United States v. Adams*, 628 F.3d 407, 416 (7th Cir. 2010) ("Our cases recognize there is a particular potential for abuse when police officers testify to out-of-court statements by confidential informants."). Limage also was not unavailable, as shown below. The hearsay thus implicated Diggs's rights under the Confrontation Clause.

Nonetheless, *Hemphill* does not undermine the court's admission of the hearsay or warrant a new trial. Although the court used the phrase "opening the door" to describe Diggs's

active participation and acquiescence in eliciting Limage's out-of-court statements, it was not the kind of "opening the door" at issue in *Hemphill*, which concerned the correction of misleading evidence. The court's ruling did not rest on the supposed need to correct misleading evidence; rather, it rested on the notion that Diggs had forfeited his Confrontation Clause rights as to the challenged testimony by himself eliciting hearsay about Francis and by failing to object to McClellan's eliciting the statement from Silk until after McClellan's cross-examination ended. Doc. 281 at 192 ("[B]ecause of the door-opening and because of the lack of an objection to the question … there was a forfeiture or a waiver of that – to that limited question as well, as well as to the answer.").

As Justice Alito observed, "a defendant can impliedly waive the Sixth Amendment right to confront adverse witnesses through conduct," as by "fail[ing] to object to the offending evidence in accordance with the [applicable] procedural standards" or "engag[ing] in a course of conduct that is incompatible with a demand to confront adverse witnesses." *Hemphill*, 142 S. Ct. at 694 (Alito, J., concurring) (internal quotation marks omitted). That is precisely what occurred here. Diggs elicited testimony from Silk that could have rested only on Limage's out-of-court statements, and he then acquiesced in McClellan's elicitation of the same. "Having made the choice to introduce the statements of an unavailable declarant, [Diggs] cannot be heard to complain that he cannot cross-examine that declarant with respect to … the declarant's related statements on the same subject." *Id*. at 695 (Alito, J., concurring).

Even if Diggs did not forfeit his Confrontation Clause objection, a new trial is not warranted because there is no reasonable possibility that the introduction of Limage's out-of-court statement prejudiced Diggs. The fact that Diggs was with Francis when Francis was attempting to sell stolen jewelry was never again mentioned at trial. And Diggs's contention that

29

the challenged statement was "the only evidence connecting [Diggs] with the stolen jewelry,"
Doc. 254 at 17, is manifestly wrong. To the contrary, the Government introduced substantial
evidence showing that Diggs committed the robbery and attempted to sell the proceeds. Adams
testified that she received a "frantic" phone call from Diggs on March 17, in which he told her
that he had "busted a J move or a J spot" and asked her to conceal the Lexus, which matched the
eyewitness descriptions of the getaway vehicle. Doc. 279 at 30-31. Diggs recruited Christian to
drive the Lexus to work and never picked up the car from her. The cell site location data from
the 901 phone, which clearly belonged to Diggs, demonstrated that he was in Hinsdale at the
time of the robbery and travelled several days later to the Microtel hotel in Atlanta, where A.P.
the Jeweler met with one of Gold Mouth's "boys" to view the stolen Razny watches. Diggs
knew both A.P. and Gold Mouth and placed or received sixteen calls to Gold Mouth from March
18-20. Doc. 280 at 59; Gov't Exh. 37. In the face of the Government's strong evidence against
Diggs, and because Limage's out-of-court statement was never again mentioned during the trial,
there is no prospect that the verdict would have been different had the statement been stricken
from the record. *See Frazier*, 213 F.3d at 415 (holding that admission of hearsay was harmless
error because "there was more than ample evidence in the record to support the convictions");
*United States v. Brown*, 31 F.3d 484, 491 (7th Cir. 1994) (holding that defendants were not
prejudiced by the court's error in admitting hearsay "in light of the weight of the remaining
evidence" of their guilt).

### 4. Exclusion of Earl Kemp's Hearsay Statements About Marcus Jones

Diggs next argues that the court erred in excluding a hearsay statement in which an
individual named Earl Kemp told two Hinsdale police officers that "Marcus Jones gave [Kemp]
the jewelry to pawn and return some of the money to Jones." Doc. 280 at 185-186; Doc. 254 at

21-22. At a bench conference during trial, Doc. 280 at 188-189, Diggs argued that the statement qualified under Evidence Rule 804(b)(3) for the "statement against interest" hearsay exception, which requires, among other things, that the declarant be "unavailable as a witness." Fed. R. Evid. 804(b). Diggs's counsel explained that the process server had twice attempted service at Kemp's address, once the day before trial and the other the first day of trial, and that it was "apparent to [the process server] that Mr. Kemp was actually at the address but was ducking the service." Doc. 280 at 188-189. The Government responded that, in the week before trial, they interviewed Kemp and informed Diggs's counsel of the interview. *Id*. at 189-190. Diggs's counsel acknowledged the point and explained that he had not asked for the Government's assistance in procuring Kemp "for strategic reasons in terms of putting a case together." *Id*. at 190. The court ruled that Kemp was not unavailable, and therefore that his out-of-court statement did not satisfy Rule 804(b)(3), because Diggs had not sought the Government's assistance in contacting Kemp. That ruling was correct.

Rule 804(a) provides that, for purposes of Rule 804(b)(3), "[a] declarant is considered to be unavailable as a witness if the declarant … is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure … the declarant's attendance or testimony." Fed. R. Evid. 804(a)(5)(B). Diggs argues that his inability to secure Kemp's presence at trial due to his evasion of service satisfies the unavailability requirement, as "nothing in Rule 804 … requires a party to do more than make reasonable efforts to subpoena a witness" or to "enlist the assistance of the government in compelling a witness to comply with a lawfully-issued subpoena." Doc. 254 at 22. The Government counters that there was no evidence of record indicating that Kemp was intentionally evading service, and that Diggs did not undertake reasonable efforts to secure his presence at trial. Doc. 268 at 27.

Noting that "[b]oth the constitution and Rule 804 strongly favor live testimony, and it is always easy to ask politely," the Seventh Circuit held that "[b]ecause the cost [to the proponent] of the request [for assistance in securing a witness's presence] is low and the benefit of a favorable response high, it is necessary to ask even when the answer is likely to be no." *United States v. Kehm*, 799 F.2d 354, 360-61 (7th Cir. 1986). Diggs was aware at least five days before trial that the Government was in contact with Kemp. Doc. 280 at 190. However, Diggs chose for "strategic reasons" not to ask the Government for assistance in contacting Kemp or securing his presence at trial; instead, Diggs attempted service on Kemp, starting the day before trial. *Id*. at 188-190. Diggs's failure to ask the Government for assistance in securing Kemp's live testimony, when it was "easy to ask politely" and the benefit of a "favorable response [was] high," precludes a finding that Kemp was unavailable. *Kehm*, 799 F.2d at 360-61; *see also Banks v. Prudential Cal. Realty*, 1994 WL 6572 at *3 (9th Cir. 1994) (holding that the trial court did not abuse its discretion in ruling that a witness was not unavailable, even though a process server made eight attempts to serve him and called his residence in the three days preceding trial, because the proponents of the witness "might have been able to serve [the witness] had they made earlier attempts").

Even if the court erred in ruling that Kemp was not unavailable for purposes of Rule 804(b)(3), there is no reasonable probability that the error prejudiced Diggs. As discussed above, the Government presented overwhelming evidence connecting Diggs to the robbery. Moreover, Kemp's statement that he and Jones were involved in pawning the stolen jewelry is not inconsistent with Diggs having committed the robbery. That is especially so given the jury's knowledge that of the three robbers who entered Razny, no more than one was on trial, as none of those three robbers had only one leg. It follows that Kemp's statement, if admitted, would not

32

have impacted the jury's evaluation of Diggs's guilt.  *See Jones v. Cross*, 637 F.3d 841, 847 (7th

Cir. 2011) ("[T]hat testimony would have done nothing to help [the defendant's] defense, and

therefore any error related to [it] was harmless.").

### B.       McClellan's Motion

McClellan argues that a new trial is warranted because the court violated the Sixth

Amendment by denying his motion two days before trial to discharge his counsel and continue

the trial, wrongly excluded Limage's deposition testimony, and erroneously responded to a jury

question, and because the Government committed misconduct during its closing arguments.

Doc. 256.

### 1.       Denial of Motion to Discharge Counsel and Continue the Trial

In April 2020, the court entered an order scheduling the trial for Tuesday, October 13,

2020.  Doc. 136.  The trial date was later moved to Wednesday, October 14, 2020.  Doc. 199.

Two days before trial, McClellan moved to discharge his retained attorney, Michael Petro, and to

continue the trial.  Doc. 201.  At a hearing the next day, Doc. 207, McClellan described his

doubts that Petro had his "best interests at heart" and would "100 percent fight for" him.

Doc. 257 at 6-7.  McClellan explained that his dispute with Petro was based on "plenty of

incidents," including Petro telling him that he was guilty, excluding certain family members

from attorney-client meetings, miscommunicating hearing dates and whether the court had ruled

on certain motions, and being hard to reach.  *Id*. at 6-8.  In addition to those recurring issues, on

the previous Friday—five days before trial—Petro asked for his trial fee; McClellan refused to

pay until Tuesday; and Petro responded that he would not start preparing for trial until Tuesday.

*Id*. at 5, 9.

At the hearing, Petro apologized, acknowledged that he should not have threatened to

postpone his trial preparations, explained that he had meant his statement as "more of a call to

action than … to indicate that I wasn't preparing," and assured the court that he "absolutely" had prepared for trial "all weekend." *Id*. at 10-11. Petro also stated that he "never told [McClellan] that I thought he was guilty," but only that "there's evidence that suggests that he's guilty." *Id*. at 11. Petro added that he had had "numerous conversations" with McClellan leading up to trial and had "done [his] best to communicate," including by "provid[ing] all documents," "ma[king] myself available," "do[ing] everything I can to send everything to Mr. McClellan to keep him in the loop," and "do[ing] everything I possibly can to come to [McClellan] and to make sure that we're able to meet" given his mobility issues. *Id*. at 5, 7, 11. Petro explained that it was a "normal attorney-client relationship" and surmised that the stress of facing the very serious potential penalties and dealing with the pandemic had caused tension between him and McClellan. *Id*. at 7, 11-12. Diggs opposed a trial continuance, as did the Government. Doc. 256-1 at 5-6.

The court declined to continue the trial because doing so would be unfair to Diggs, who (unlike McClellan) was in pretrial detention and whose "only shot of getting out [of custody] in the near future" was going to trial. *Id*. at 16-17. The court also declined, for two reasons, to sever McClellan's trial and proceed the next day solely against Diggs. *Id*. at 17-18.

First, the court was unwilling to impose the burden of coming to the courthouse for voir dire on two separate venires, the burden of hearing trial on two separate juries, and the burden on 20-25 witnesses (including four victims of the robbery) of testifying twice. Doc. 257 at 14. The court explained that, even putting aside the pandemic, "under any circumstances, [it] would not want to put [the victims] through doing this twice" and would not "put all of [the witnesses] and the government to the task of reassembling everybody a second time." Doc. 256-1 at 17.

Second, the court found that the issues between McClellan and Petro fell "far, far short" of the threshold for outweighing those considerations. *Id*. at 18. The court explained that Petro had been preparing for trial despite the fee dispute. Doc. 257 at 15. As for Petro's alleged remark that he thought McClellan was guilty, the court noted that it was a defense attorney's obligation to give his or her client an honest assessment of the evidence, and that even knowing that a client is guilty does not necessarily affect the zeal with which counsel provides a defense. *Id*. at 16. The court stated further that tension, "cross words," and "butting of heads" between defendants and counsel was not atypical preceding high-stakes trials and did not suggest that Petro would be unable to fulfill his professional obligations. *Id*. at 16-17. Last, the court held that the recurring communication issues cited by McClellan could not justify granting a severance the day before trial, as those issues had not been brought to the court's attention until the eleventh hour. *Id*. at 17.

The question whether the denial of a motion to substitute counsel and continue a trial violates the Sixth Amendment turns on "two questions: (1) was the trial court's denial of his motion for substitution of counsel and a continuance arbitrary[,] and if so, (2) did the denial have an adverse effect on the presentation of his case?" *Carlson v. Jess*, 526 F.3d 1018, 1025 (7th Cir. 2008). "[T]rial judges have broad discretion over continuance requests premised on the Sixth Amendment right to counsel of choice," and "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel [of choice]." *United States v. Sinclair*, 770 F.3d 1148, 1154 (7th Cir. 2014) (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)). "[A]s a general rule, once a trial date has been set, the court ought to adhere to that date unless there are compelling reasons to grant a continuance." *United States v. Jones*, 455 F.3d 800, 804 (7th Cir. 2006). "[A]t the same time, a

court cannot have a myopic insistence upon expeditiousness in the face of a justifiable request for delay." *United States v. Isaacs*, 593 F.3d 517, 525 (7th Cir. 2010) (internal quotation marks omitted).

The court's determination that the communication and trust issues between McClellan and Petro did not warrant imposing serious burdens on a second venire, a second jury, and 20-25 witnesses was not "unreasoning and arbitrary." *Morris*, 461 U.S. at 11; *see also Sinclair*, 770 F.3d at 1155 (holding that, "[b]y considering th[e] interests" of 34 jurors and six witnesses, "the judge did not arbitrarily stick to the schedule for its own sake."). As the court explained, McClellan's disagreements with Petro were of the type that often arise in attorney-client relationships. And there was no indication that Petro, who had been working on the case since April 2018, Doc. 28, had in fact failed to prepare for trial; indeed, Petro zealously defended McClellan. The court's balancing of McClellan's request for a continuance against the inconvenience and distress to the many jurors and witnesses (including victims) who would be involved in a second trial, particularly during the pandemic, was reasonable. *See Sinclair*, 770 F.3d at 1154-55 ("On the eve of trial, as compared to earlier in the litigation, the interests of the government, the witnesses, the jurors, and the court will be particularly strong.").

*Carlson* does not compel a different result. The defendant in *Carlson* moved to discharge his counsel and continue his trial based on counsel's complete failure to communicate anything to him regarding his case. 526 F.3d at 1022. The state trial court denied the motion, even though the trial was expected to last at most two days, the prosecutor planned on calling only two witnesses, and the defendant had been arraigned only 90 days earlier. *Id*. at 1020-21. The court's only reason for denying the motion, besides the efficient administration of its docket, was that the victim was a juvenile who should not "have this hanging out over [his] head," *id*. at

1022—a rationale that held little weight given that the victim had waited six years after the alleged incident to report it, *id*. at 1026. *Carlson* is inapposite, as McClellan's issues with Petro were comparatively minor, Petro was prepared for trial, McClellan delayed unduly in bringing certain communication and trust issues to the court's attention, the trial was to last one week, and granting the motion would have imposed a severe burden on a second venire, a second jury, and some two dozen witnesses.

### 2.    Exclusion of Limage's Deposition

In August 2020, the Government deposed Limage—Agent Silk's confidential informant—with cross-examination by Diggs and McClellan. Docs. 172, 177. The Government did so pursuant to Criminal Rule 15, which allows parties to depose a prospective witness "in order to preserve testimony for trial." Fed. R. Crim. P. 15(a)(1). The Government sought the deposition to preserve Limage's testimony in the event he was deported to Haiti before trial. Doc. 159 at ¶¶ 7-10; Doc. 178 at ¶¶ 1, 5.

At the deposition, Limage testified that he had learned about the robbery from Francis, who Face-Timed him the day after the robbery to tell him that "Chief and two brothers" had robbed a jewelry store. Doc. 191-1 at 18-19, 42, 93, 99-100. That was the first time Limage had heard about the robbery. *Id*. at 42. On the call, Francis showed Limage a bag of the stolen jewelry and offered to sell him a stolen Rolex watch. *Id*. at 42-43, 100. Limage testified that Francis was not involved in the robbery. *Id*. at 51-52. When Limage was asked to identify McClellan, who was attending the deposition, he testified that he did not know who McClellan was. *Id*. at 89, 118-119. Limage also testified that, if deported, he would be willing to return to the United States from Haiti to testify at trial. *Id*. at 86.

37

At a hearing on October 9, 2020—five days before trial—the Government informed the court and Defendants that it did not intend to present Limage's live or deposition testimony at trial. Doc. 280 at 170. On October 18, after three days of trial, McClellan moved to introduce portions of the Limage deposition. Doc. 212. The court denied the motion, holding that the deposition did not qualify as "former testimony" under Rule 804(b)(1) because Limage was not "unavailable" as a witness within the meaning of Rule 804(a)(5)(A). Doc. 280 at 138-139, 162-165, 170-171. The court explained that for Limage to be "unavailable," McClellan, as the deposition's proponent, had to have made a good-faith effort to secure Limage's presence at trial. *Id*. at 163. The court explained further that, under *Kehm*, even though "[f]utility excuses a request" to secure a witness's presence, 799 F.2d at 360, the mere fact that Limage had been deported to Haiti did not make a request futile, as McClellan could have asked the Government to arrange for Limage's return to the United States. Doc. 280 at 158-162. Because McClellan had not made any attempt to secure Limage's presence at trial after the Government announced that it would not present him either live or by deposition, because Limage had offered to return to this country to testify, and because a request to the Government to bring him back to testify would not have been futile, the court found that Limage was not unavailable under Rule 804(a)(5)(A). Doc. 280 at 163-164.

McClellan argues that it was unfair to exclude the Limage deposition because, as late as the day before trial, the Government misled Defendants into thinking that it was going to present him live at trial. Doc. 256 at 4-7. According to McClellan, by the time defense counsel realized that the Government no longer intended to present Limage, it was too late to secure his presence, making futile any attempt to do so. *Id*. at 6-7. The Government responds that it informed Defendants on October 8—six calendar days before trial—that it did not intend to present

Limage or his deposition at trial; that Limage had stated multiple times that he was willing to return to the United States to testify; and that, in any event, the court's ruling was "inconsequential" because the deposition was duplicative of other evidence that was admitted. Doc. 268 at 10-13. In his reply brief, McClellan does not dispute that the Government informed him on October 8 that it did not intend to use the Limage deposition or present him live at trial; rather, McClellan argues that attempting to secure Limage's attendance at that time still would have been futile. Doc. 272 at 4-6.

As the court explained in its oral ruling at trial, Rule 804(b)(1) requires a witness to be "unavailable"—defined as being "absent from the trial … and the statement's proponent has not been able, by process or other reasonable means, to procure[] the declarant's attendance," Fed. R. Evid. 804(a)(5)(A)—to allow the introduction at trial of the witness's former testimony. Fed. R. Evid. 804(b)(1). In *Kehm*, the Seventh Circuit held that the proponent must attempt to secure the witness's attendance unless the probability of success is "close to zero." 799 F.2d at 360-61. *Kehm* made clear that a witness is not unavailable simply because he or she is in a foreign country. *See id.* at 360-62 (conducting a fact-specific analysis to determine whether a potential witness located in a foreign country was unavailable).

At the time McClellan learned that the Government no longer intended to introduce Limage's deposition or present him live at trial, it would not have been futile to attempt to secure his presence by contacting his attorney and asking the Government for assistance in allowing him into the country. As the court explained, those requests had a chance of success much higher than "close to zero," as Limage testified that he was willing to return to the United States to testify, and the Government could have asked for written consent from the Attorney General or Secretary of Homeland Security—that is, from itself—to allow him into the country.

Doc. 280 at 158-161. McClellan's failure to attempt to secure Limage's presence in that manner precludes a finding of unavailability under Rule 804(a)(5)(A).

McClellan is wrong to suggest that the Government's statement the day before trial that some of its witnesses were "going to be deported very shortly" misleadingly suggested that it intended to call Limage in person at trial. Doc. 256 at 5. That is an unreasonable interpretation of the Government's statement, which referred only to A.P. the Jeweler, who was scheduled to be deported to Azerbaijan in January 2021. Doc. 268 at 8.

In any event, McClellan was not prejudiced by the exclusion of the Limage deposition. McClellan contends that the deposition would have shown that, "on the day after the robbery, a party other than defendant, who had no connection to Mr. McClellan, was in possession of and trying to fence a large bag of jewelry, including a Rolex watch," and that "this witness did not know Mr. McClellan, despite having somewhat extensive knowledge of the robbery." Doc. 256 at 4. To begin with, the fact that Francis possessed a large bag of jewelry from the robbery and was trying to sell a stolen Rolex watch came out during McClellan's cross-examination of Agent Silk. Doc. 280 at 246. Limage's deposition would have simply made the same point. In addition, the portions of the deposition that McClellan sought to admit did not show that Limage had "extensive knowledge of the robbery"; they showed only that Francis called Limage via FaceTime with a bag of jewelry from the robbery and offered to sell him a Rolex. Doc. 212. That Limage neither knew McClellan nor knew of his involvement in the robbery thus has little probative value, especially given the significant evidence tying McClellan to the robbery.

Indeed, McClellan likely would have been harmed, not helped, if the Limage deposition were introduced at trial. As the Government observed at the time, if the court had admitted the portions designated by McClellan, it would have sought to introduce other portions in which

Limage testified that Francis told him that he had obtained the jewelry from "Chief and two brothers." Doc. 280 at 5-6; Doc. 191-1 at 100. Coupled with Adams's testimony that Diggs drove to Atlanta "with Bro and them," Doc. 279 at 63; that "Bro" was "Mac" in Adams's phone contacts and referred to "Jonathan McClennan," *id*. at 59; and that Mac had a brother whose phone number, saved as "Mac Bro," was (312) 286-6883, *id*. at 62-63—the number associated with Joshua McClellan, Doc. 280 at 39—Limage's testimony suggests that the "two brothers" who committed the robbery with Diggs were Jonathan and Joshua McClellan. Thus, even if the Limage deposition testimony should have been admitted under Rule 804(b)(1), its exclusion did not prejudice McClellan.

### 3. Court's Response to Jury Question Regarding Physical Presence in the Store

During its deliberations, the jury sent a note to the court asking: "Does Joshua [McClellan] have to be physically there at the jewelry store when the subject comes up (1) the defendant knowingly obtained money/or in the presence of the victim?" Doc. 232 at 1. In its response, the court re-phrased the question as: "Does a person have to be physically present in the store in order to be even conceivably guilty of robbery," and instructed the jury that "the answer to that is no. It is possible to be guilty of robbery even if the defendant did not step foot into the store." Doc. 283 at 9-10. The court added that it was "just answer[ing] a pure legal question," and it reminded the jury that "[t]he question for you is: If you believe that a defendant did not enter the store, is that person guilty of robbery? And that's up to you. You have to decide what the facts are, and you have to apply the law to those facts." *Id*. at 10. After instructing that jury that they "must consider the robbery instructions as a whole and all of the instructions as a whole," the court re-read the following instructions: the definition of acting "knowingly"; the aiding and abetting instruction, which states that "[a] person who knowingly

aids, counsels, commands, induces, or procures the commission of an offense may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed"; the joint venture instruction, which states that "[a]n offense may be committed by more than one person. A defendant's guilt may be established without proof that the defendant personally performed every act constituting the crime charged"; the definition of "robbery"; the "mere presence" instruction, which states that "[a] defendant's presence at the scene of the crime and knowledge that a crime is being committed is not sufficient by itself to establish the defendant's guilt"; and an instruction stating that, "[i]f a defendant performed acts that advanced the crime but had no knowledge that the crime was being committed or was about to be committed, those acts are not sufficient by themselves to establish the defendant's guilt." *Id*. at 10-11. McClellan challenges the court's response on several grounds.

First, McClellan argues that the court's use of the phrases "even conceivably guilty" and "is it possible" "suggest[ed] to the jury that the government's burden might be easier than the law requires." Doc. 256 at 9. That argument has no merit. It is clear from context that the court used those phrases to ensure that the jury understood that it was answering a "purely legal question" and that the court was not weighing in on whether either defendant was, in fact, guilty. Doc. 283 at 9-10. No reasonable interpretation of the court's answer suggests that the jury had to find only that it was "possible" or "conceivable" that McClellan had committed the robbery in order to convict him. Moreover, as the court noted in a colloquy with McClellan's counsel, the court had mentioned the "beyond a reasonable doubt" burden of proof at least a dozen times during the trial. *Id*. at 12. The court's answer thus did not impermissibly allow the jury to convict McClellan based on proof lower than beyond a reasonable doubt.

Second, McClellan argues that the court's response "pointed the jury to the specific instructions it needed to convict without providing equal weight to the instructions on the government's burden." Doc. 256 at 10. McClellan submits that the court should also have instructed the jury on the Government's burden of proof, the "guilt by association" instructions, and "other instructions designed to protect McClellan's rights," such as the presumption of innocence. *Ibid*; Doc. 272 at 6. This argument fails as well.

"When a jury makes explicit its difficulties[,] a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *see also United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003) ("[T]he district court retains broad discretion in deciding how to respond to a question propounded from the jury and … has an obligation to dispel any confusion quickly and with concrete accuracy."). "When examining the appropriateness of the language in a supplemental instruction, [the court] consider[s]: 1) whether the instruction as a whole fairly and adequately treated the issue; 2) whether the supplemental instruction was a correct statement of law; and 3) whether the district court answered the jury's question specifically." *Sims*, 329 F.3d at 943. Evaluated in light of these considerations, the court's response was proper.

As to the first consideration, the court's answer fairly balanced the pertinent instructions: in addition to reading the definitions of "knowingly" and "robbery," which are fairly neutral, the court read two instructions expanding criminal liability—relating to the aiding and abetting and joint venture theories of culpability—and two instructions constricting liability—the mere presence instruction and the instruction that advancing a crime without knowledge of it is insufficient to establish guilt. Doc. 283 at 10-11. Even if the court's answer had focused solely on the aiding and abetting and joint venture instructions, it still would have been appropriate, as

the court "did nothing but present the jury with the relevant portions of the instructions that had already been given to the jury and with which the defendant had registered no objection." *United States v. Bitterman*, 320 F.3d 723, 728 (7th Cir. 2003) (holding that a court's response to a jury request for further explanation of the aiding and abetting instruction, in which the court reiterated only the aiding and abetting instruction and the knowledge requirement, was proper); *see also United States v. Karlin,* 852 F.2d 968, 974 (7th Cir. 1988) (noting with approval that "[t]he judge had just repeated the portion of his instructions" relevant to answer the jury's question). Moreover, there is no contention, nor any indication, that the full set of jury instructions, which the court twice reminded the jury to consider in its answer, Doc. 283 at 10, did not "fairly and adequately treat the issues." *Bitterman*, 320 F.3d at 728.

As to the second and third considerations, the court's response correctly answered the jury's question by explaining that "[i]t is possible" for a defendant to be guilty of robbery without physically entering the store; reiterating the robbery, knowledge, aiding and abetting, and joint venture instructions; and instructing the jury to determine the facts and to consider "all of the instructions as a whole" in reaching its verdict. Doc. 283 at 9-11. It follows that the court's answer was appropriate.

### C. Government's Closing Arguments

Diggs and McClellan argue that the Government's closing arguments improperly impugned defense counsel, referenced inadmissible or factually incorrect evidence, and relayed the prosecutor's personal opinions. Doc. 254 at 22-25; Doc. 256 at 10-12. When a new trial motion is based on the prosecutor's allegedly improper statements, the court's "analysis proceeds in two phases: [the court] first look[s] at the disputed remarks in isolation to determine if they are proper" and, "[i]f they are improper," the court "then consider[s] the remarks in light of the entire record to determine if the defendant was deprived of a fair trial." *United States v.*

44

*Tantchev*, 916 F.3d 645, 657 (7th Cir. 2019) (internal quotation marks omitted). In determining whether the defendant was deprived of a fair trial, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Olson*, 450 F.3d 655, 674 (7th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). That inquiry requires consideration of six factors: "(1) whether the prosecutor misstated evidence; (2) whether the remarks implicate specific rights of the accused; (3) whether the defense invited the comments; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut the improper remarks." *Evans v. Jones*, 996 F.3d 766, 778-79 (7th Cir. 2021). "The fifth factor"—the weight of the evidence against the defendant—"is the most important, because strong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Tantchev*, 916 F.3d at 657 (internal quotation marks and alterations omitted). "A challenge of this kind is an uphill battle; improper statements during closing arguments rarely constitute reversible error." *United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017).

The court reviews any remarks to which defense counsel did not object at trial for plain error. *United States v. McKee*, 389 F.3d 697, 699 (7th Cir. 2004). "[C]hallenged remarks cannot be plain error unless [the defendant] probably would have been acquitted if the prosecutor had not made them." *Klemis*, 859 F.3d at 441.

### 1. Diggs's and McClellan's Common Arguments

Diggs and McClellan argue that the Government's closing arguments "improperly and repeatedly chastised defense attorneys for making objections and for contesting certain elements of the government's case." Doc. 254 at 22; Doc. 256 at 10-11.

In closing, the prosecutor argued that Defendants' strategy of "say[ing] that their phones weren't their phones" proved "how deadly and devastating the phone evidence is." Doc. 281 at 233. Diggs's counsel objected, submitting that the argument was misleading because Diggs's phone was not in evidence. *Ibid*. The court overruled the objection—as there was substantial evidence at trial that Diggs used the 901—but reminded the jury that the lawyers' arguments were not evidence. *Ibid*. When the Government resumed its argument, it pointed out that defense counsel had just objected and remarked, "You see, ladies and gentlemen, how adamant they are?" *Ibid*. Counsel for Diggs and McClellan objected *only* to the Government's use of the pronoun "they," and the court reminded the jury to consider each defendant separately. *Id*. at 233-234. The prosecutor then remarked: "So now you see both defense attorneys, they don't want to be near these phones, right? … Why are they so afraid of the phones?" *Id*. at 234. Neither defendant objected to that remark. *Ibid*. A few minutes later, after noting that the evidence showed that the 901 phone belonged to Diggs, the prosecutor asked sarcastically, "Is there an objection?" *Ibid*. Diggs's counsel objected, and the court sustained the objection and directed the jury to "strike [the prosecutor's] latest remark." *Id*. at 235. Of the above-referenced remarks, only one—where the prosecutor sarcastically asked, "Is there an objection?"—was objected to by either defendant on the ground that it criticized defense counsel for making objections.

The Government's critique of counsels' prior objections was inappropriate. Although the Government "may criticize defense tactics … the government should not … encourage[] the jury to draw a negative inference from defense counsel's objection during trial." *United States v. Chavez*, 12 F.4th 716, 731 (7th Cir. 2021). Nonetheless, the critiques did not "so infect[] the trial with unfairness" as to warrant a new trial, *Olson*, 450 F.3d at 674, as most of the pertinent

factors—and, most importantly, the weight of the evidence against each defendant—strongly favor the Government.

Two of the pertinent factors lean in Defendants' favor: the prosecutor's remarks were not invited by the defense, and they may have implicated Defendants' right to counsel, a "specific right[] of the accused," by "operat[ing] to the detriment of a defendant's quality of representation." *Bates v. Bell*, 402 F.3d 635, 647 (6th Cir. 2005). But the other factors favor the Government. While two remarks improperly encouraged the jury to draw a negative inference from defense counsels' objections, they did not misstate the evidence. In addition, the court sustained the only objection that either defendant made on the ground that the prosecutor's remark improperly criticized defense counsel for objecting to the phone evidence. *Ibid*. Diggs's counsel also had and made use of the opportunity to rebut any improper remarks by telling the jury, in his closing argument, that the prosecutor's criticism of defense counsel for objecting was improper. Doc. 282 at 15-16. Last, and most importantly, it is implausible that the prosecutor's inappropriate remarks affected the outcome of the trial because the phone evidence against Diggs and McClellan was very powerful.

As to Diggs, numerous pieces of evidence convincingly tied him to the 901 number, including the message from his Instagram account asking the recipient to "[c]all me" at the 901 number; the entry for "Bais" in McClellan's contacts listing the 901 number; the common call analysis showing that the 901 number made or received calls from numerous people connected to Diggs; and Adams's text message sending the 901 number to Diggs's mother. The cell site location evidence showed that the 901 number was in Hinsdale at the time of the robbery, traveled from Chicago to Atlanta several days later, and was at the Atlanta Microtel the day that A.P. the Jeweler met with McClellan and posted photographs of stolen Razny watches. Adams's

testimony that Diggs told her that he had "busted a J move or a J spot" further corroborated that evidence, making it even more unlikely that the prosecutor's improper critique of Defendants' objections impacted the jury's verdict against Diggs.

As to McClellan, the evidence from his phone—including deleted text messages in which he discussed "going to check the spots out," having "something super sweet for us on some big money shit," "run[ning] through the plan," "tak[ing] sumthin," and meeting with A.P. in Atlanta; cell site location data placing his phone in Hinsdale at the time of the robbery, traveling from Chicago to Atlanta several days later, and at the Atlanta Microtel on the day that he met with A.P., Doc. 279 at 163; and a picture of McClellan with $100 bills on his lap the day of the sale of Herman's engagement ring—convincingly demonstrated his participation in the robbery. The testimony and surveillance footage depicting a one-legged man selling the engagement ring further corroborated that evidence, making it even more unlikely that the prosecutor's improper remarks impacted the jury's verdict against McClellan.

In light of the overwhelming evidence connecting both Diggs and McClellan to the robbery, the prosecutor's remarks criticizing counsel for objecting to the phone evidence did not deprive them of a fair trial. That is especially so given that the court struck from the record the single remark to which Defendants objected as improperly criticizing defense counsel for objecting, Doc. 281 at 234, and given that the remaining remarks are subject only to plain error review. *See McKee*, 389 F.3d at 699. Under the exacting plain error standard, and in light of the ample evidence of Defendants' guilt, it is implausible that Defendants "probably would have been acquitted if the prosecutor had not made" those remarks. *Klemis*, 859 F.3d at 441.

Defendants next argue that the prosecutor improperly "criticiz[ed] Defendant[s] for advancing a defense rather than admitting that Adams's car was used in the robbery" by stating,

48

"God forbid we just own up that it was the robbery vehicle." Doc. 254 at 23; Doc. 256 at 11;

Doc. 281 at 249. The prosecutor's remark was not improper. As noted, "[t]he government may

criticize defense tactics, but not defense counsel." *Chavez*, 12 F.4th at 731. The prosecutor's

remark fell on the permissible side of the line because it criticized the weakness of defense

counsels' argument. *See United States v. Bloom*, 846 F.3d 243, 254 (7th Cir. 2017) (holding that

the prosecutor's remarks—that defense counsel's cross-examination was "practically bordering

on a waste of the jury's time" and that counsel was "putting up a smoke screen"—were

permissible because the prosecutor "criticized defense counsel's tactics, not defense counsel

personally"); *United States v. Washington*, 417 F.3d 780, 786-87 (7th Cir. 2005) (finding no

misconduct where the prosecutor characterized defense counsel's arguments as "made up,

absolutely false, ridiculous, or ludicrous," reasoning that the prosecutor's remarks "focused on

the lameness of the defense rather than defense counsel personally"). Even if the prosecutor's

remark had been improper, it could not have prejudiced Defendants, as the court sustained

defense counsel's objection to it and directed the jury to disregard it. Doc. 281 at 249.

### 2.      Diggs's Arguments

Diggs argues that the prosecutor's closing arguments impermissibly referred to three

pieces of evidence that either were not admitted into evidence or that the court had specifically

ruled were inadmissible, and that the prosecutor improperly stated his personal opinion of the

evidence. Doc. 254 at 24-25.

The first challenged remark is the prosecutor's statement that Mickey Weisz—one of the

eyewitnesses who saw the getaway car pick up the robbers from the alley behind Razny—had

stated in an interview with the Hinsdale police, conducted the day of the robbery, that he was

"100 percent sure that it was a Michigan plate." Doc. 281 at 248. Diggs correctly contends that

this remark "referred to evidence that the Court had specifically ruled inadmissible." Doc. 254 at

24. On cross-examination by Diggs's counsel, Weisz testified that the prosecutors had recently

showed him a video of his interview with the Hinsdale police in which he gave his eyewitness

account. Doc. 278 at 131. On redirect examination, the prosecutor moved to admit the recording

of the police interview; Diggs's counsel objected; and the court ruled that the prosecutor could

neither introduce the recording nor ask Weisz what he told the police, but that the prosecutor

could ask Weisz whether he was 100 percent sure, on the day of the robbery, that the getaway car

had Michigan plates. Doc. 278 at 134-140.

So, Diggs is correct that the court excluded the evidence to which the prosecutor's

closing argument referred—that Weisz told the police the day of the robbery that he was "100

percent sure" that the getaway car had Michigan plates, Doc. 281 at 248—making that remark

improper. *See Solles v. Israel*, 868 F.2d 242, 250 (7th Cir. 1989) (noting that "reference[s] to

excluded evidence" are improper). Nonetheless, the remark did not deprive Diggs of a fair trial.

Most of the pertinent factors weigh against Diggs: the remark did not "implicate other specific

rights of the accused such as the right to counsel or the right to remain silent," *Evans*, 996 F.3d at

779 (quoting *Darden*, 477 U.S. at 182); the court repeatedly "instructed the jury to disregard any

argument made by the attorneys that is not based on evidence," *ibid*.; *see* Doc. 281 at 207, 233;

Doc. 282 at 15; and defense counsel had "ample opportunity to object or otherwise respond,"

*Klemis*, 859 F.3d at 442, given that counsel "made his closing argument after the prosecutor

made the offending statement," *Tantchev*, 916 F.3d at 657.

Most importantly, the evidence that Adams's Lexus was the getaway car was

overwhelming, and the import of the excluded evidence was minimal. Properly admitted

evidence showed that Weisz spoke to police on the day of the robbery, and that, on that day, he

was "100 percent" sure that the getaway car had Michigan license plates. Doc. 278 at 131, 134,

140. It is true that the prosecutor's suggestion that Weisz had *told* police that day that he was

"100 percent sure" about the Michigan plates strengthened the credibility of his testimony. But

there is no basis for the jury to have had any reason to doubt Weisz's truthfulness, especially

when another eyewitness likewise testified that the getaway car was a "silverish-blue" Lexus. *Id.*

at 146. And even without any of Weisz's testimony, Adams's testimony that Diggs had asked

her to retrieve her car—a blue Lexus with Michigan license plates, Doc. 279 at 31-33; Gov't

Exhs. 44-1, 44-2—because he had "busted a J move" and "the car was on the news," Doc. 279 at

31-32, conclusively established that the getaway vehicle was Diggs's Lexus with Michigan

plates. Coupled with the evidence that Diggs had access to her Lexus at the time of the robbery,

*id.* at 31-33, and that Diggs offered Christian the Lexus on March 17 but never retrieved it, *id.* at

182-187, there is no question that the prosecutor's remark about Weisz's statement to the

Hinsdale police did not render the trial unfair.

The second remark challenged by Diggs is the prosecutor's statement that Adams "had

immunity [because] [s]he was going to help him hide the car." Doc. 254 at 25; Doc. 281 at 242.

Diggs argues that the remark was improper because "no such evidence was presented to the

jury." Doc. 254 at 25. That argument is unpersuasive. "Although prosecutors may not infuse

their closing arguments with facts that the court has not admitted into evidence, they may argue

reasonable inferences from the evidence that the jury has seen and heard." *United States v.

Klebig*, 600 F.3d 700, 718 (7th Cir. 2009) (internal quotation marks omitted). An inference is

reasonable when "the evidence bears logical and proximate connection to the point the

prosecutor wishes to prove." *Ibid.* (internal quotation marks omitted). Adams testified that she

understood that she needed immunity because she was "involved with this crime in some sort of

way," Doc. 279 at 133-134, admitted that she was "asked to come and pick up the getaway car" by Diggs, *id*. at 134, and testified that she asked her father, stepfather, and possibly her mother to give her a ride into the city to get her car back, *id*. at 37-38. That evidence strongly supports the inference that the prosecutor asked the jury to draw—that Adams needed and was given immunity because she had attempted to assist Diggs in the aftermath of the robbery.

The third remark challenged by Diggs is the prosecutor's statement, "I didn't choose to call his wife as a witness." Doc. 254 at 25; Doc. 281 at 240. Diggs argues that this was a "false claim," as the Government "in fact … did" choose to call Adams as a witness. Doc. 254 at 25. That argument has no merit. In context, it is clear that the prosecutor's statement was not literal, but rather made the point that Diggs, not the Government, was responsible for involving Adams in the robbery. The prosecutor stated: "I didn't choose to call his wife as a witness. He did when he called her after the robbery and asked her to come and take the car. That's not the government's decision. We don't choose the witnesses. The people who committed the crime choose them." Doc. 281 at 240. As the only reasonable interpretation of the remark is that Diggs was to blame for involving Adams in the trial, the remark was not improper.

Last, Diggs argues that the prosecutor "improperly injected his own personal views of the evidence" by stating, "I don't care" after discussing evidence or arguments made by the defense. Doc. 254 at 25. "[I]t is improper for the prosecutor to express his personal opinion about a defendant's guilt." *United States v. Auerbach*, 913 F.2d 407, 418 (7th Cir. 1990). But the prosecutor's statements did not prejudice Diggs, as the court sustained defense counsel's objection to them and instructed the jury to "construe [the prosecutor's] statements about him not knowing and him not caring as him saying it doesn't matter for purposes of your deciding this case." Doc. 281 at 259-260.

### 3. McClellan's Arguments

McClellan argues that the prosecutor's remarks concerning defense counsels' objections were improper because the prosecutor repeatedly used the pronoun "they." Doc. 256 at 10-11; Doc. 272 at 7-8. According to McClellan, the prosecutor misstated the evidence by suggesting that *both* defense counsel contested ownership of the phones, when in fact "McClellan never argued that the phone was not his." Doc. 256 at 10. McClellan contends that the use of the pronoun "they" prejudiced him by "creat[ing] a likelihood that evidence which related solely to [Diggs] could be considered against him as well." Doc. 272 at 8.

True enough, the prosecutor suggested that both defense counsel attempted to distance their respective clients from the phones in question. Doc. 281 at 233-234 (prosecutor arguing that "these two guys [defense counsel] … say that their phones weren't their phones," "You see, ladies and gentlemen, how adamant they are? 'Don't tie us to the phone numbers,'" and "So now you see both defense attorneys, they don't want to be near these phones, right?"). McClellan did not contest ownership of his phone or its contents, making the prosecutor's remarks inaccurate.

Still, there is no reasonable probability that the prosecutor's use of the pronoun "they" caused the jury to consider evidence relating solely to Diggs in evaluating McClellan's culpability. When McClellan's counsel objected to the prosecutor's remark, "You see, ladies and gentlemen, how adamant they are? 'Don't tie us to the phone numbers,'" the court instructed the jury to "consider each defendant separately" and reminded the jury that the court had "already talked to you about that on several occasions." *Ibid*. The prosecutor reinforced that instruction by stating that the "evidence [that Diggs and McClellan committed the robbery] is a little different," separately laying out the evidence for the two, and telling the jury multiple times that he was "just focusing on Diggs first, and then I'm going to go to Mr. McClellan." *Id*. at 239,

262-63, 265.  Moreover, the overwhelming evidence that McClellan committed the robbery—including his text messages, the cell site location data, and his sale of Herman's engagement ring to W.A. Jewelers—defeats his argument that the prosecutor's inaccurate use of the pronoun "they" prejudiced him.  *See Tantchev*, 916 F.3d at 657 ("[S]trong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations.") (internal quotation marks omitted).

McClellan next argues that the prosecutor "improperly vouched for" Special Agent Raschke, who testified about the cell site location data, as "the special agent who rescues kidnapped children."  Doc. 256 at 11-12; Doc. 281 at 269.   The Seventh Circuit has "recognized two types of impermissible vouching: a prosecutor may not express her personal belief in the truthfulness of a witness, and a prosecutor may not imply that facts not before the jury lend a witness credibility."  *Flournoy*, 842 F.3d at 529 (internal quotation marks omitted).  "A prosecutor may, however, comment on a witness' credibility as long as the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion."  *United States v. Wolfe*, 701 F.3d 1206, 1212 (7th Cir. 2012) (internal quotation marks omitted).

As the prosecutor's remark did not express his personal belief about Raschke's credibility, the remark was impermissible only if it "impl[ied] that facts not before the jury" lent him credibility.  *Flournoy*, 842 F.3d at 529.  But the facts referenced by the prosecutor *were* properly before the jury, as Raschke testified that he had performed historical cellular analysis in "all kinds of investigations," including "kidnapping investigations" in which the victims were recovered.  Doc. 281 at 41, 153-155.  In addition, after an objection to the prosecutor's remark, the court instructed the jury that it "was just an example that the agent used to describe how he had previously used this cell site location information technology."  *Id*. at 270.  As the

kidnapping remark did not express the prosecutor's opinion and was drawn directly from "the evidence adduced at trial," it was not improper. *Wolfe*, 701 F.3d at 1212.

*     *     *

As most of the alleged trial errors raised by Defendants were not errors at all, and as there is no reasonable probability that any errors jeopardized their substantial rights or had any impact on the jury's verdicts, their new trial motions are denied. *See Kuzniar*, 881 F.2d at 470; *Flournoy*, 842 F.3d at 530.

## II.    Rule 29 Motions

Rule 29(a) provides that the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant challenging the sufficiency of the evidence must convince [the court] that even after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (internal quotation marks omitted). "[The court] will set aside a jury's guilty verdict only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (internal quotation marks omitted).

### A.    Diggs's Motion

Diggs's argument for acquittal consists solely of the contention that, "on each of the four counts of conviction … the evidence is insufficient to prove that [Diggs] is guilty beyond a reasonable doubt." Doc. 254 at 1. At trial, Diggs did not contest that the robbery occurred or that "the people who … committed that horrible robbery should be convicted." Doc. 278 at 32. Rather, Diggs argued that the evidence did not prove that he was one of the robbers. Doc. 278 at

34; Doc. 282 at 11. That is presumably the basis for Diggs's motion for acquittal. That argument fails given the substantial evidence that he committed the robbery.

To begin with, Adams testified that she received a "frantic" phone call from Diggs the day of the robbery, in which he "said that the car was on the news" and asked her to return to the city to retrieve it "because he had busted a J move or a J spot," referring to a jewelry store. Doc. 279 at 30-31. Diggs's access to and further attempts to conceal the getaway car lent credence to Adams's account. The getaway car was described by two eyewitnesses as a silver-blue Lexus with Michigan plates, Doc. 278 at 122, 146—a description that matches Adams's Lexus, Doc. 279 at 31-33. At the time of the robbery, Diggs—who drove the Lexus when she was out of town—had the keys to the car, which Adams had left at Diggs's mother's house while she was visiting her parents in Michigan. *Id*. at 31, 182-183. On the day of the robbery, Diggs offered Christian the car. *Id*. at 182-183. Although Diggs told her he would pick it up, he never did, and the car was eventually recovered from her garage by law enforcement. *Id*. at 186-187.

In addition to Diggs's statement to Adams that he had robbed a jewelry store, the cell site location data from the 901 phone convincingly demonstrated his participation in the robbery. The 901 phone connected to a cell tower 1.48 miles from Razny Jewelers twenty minutes before the robbery, Doc. 281 at 72; traveled from Chicago to Atlanta two days later, *id*. at 79-81; and connected to a cell tower near the Atlanta Microtel hotel, *id*. at 98—where A.P. the Jeweler met with several men to look at the stolen watches, Doc. 279 at 163-164—the day McClellan met A.P. there, Doc. 280 at 111-115. Moreover, the fact that the 901 phone received an approximately 25-minute call that connected to the cell tower 1.48 miles away from Razny, Doc. 281 at 72, and ended when the robbers left the store, Doc. 280 at 54-56, suggests that it was

used to communicate with the getaway driver during the robbery. And the evidence left no question that the 901 number was Diggs's phone. A message from Diggs's Instagram account asked the recipient to "[c]all me" at the 901 number, *id*. at 33-34; the 901 number, along with Adams's cell number, is listed in the entry for "Bais" in McClellan's contact list, *id*. at 66; a common call analysis shows that the 901 number made or received calls from numerous people connected to Diggs, *id*. at 41-46; and Adams texted the 901 number to Diggs's mother, who had asked for Diggs's number, Doc. 279 at 51-53.

Moreover, phone records from the 901 phone show that Diggs was in touch sixteen times from March 18-20 with Gold Mouth, whom A.P. the Jeweler identified as the man who had set up the meeting at the Microtel in which A.P. was offered the stolen watches. Doc. 280 at 59; Gov't Exh. 37; Doc. 279 at 162-163. Two pictures of Diggs with A.P., posted on Diggs's social media accounts, further corroborate that Diggs knew A.P. and suggest that he was involved in organizing the Atlanta meeting. Doc. 279 at 169-173; Doc. 280 at 13; Gov't Exhs. 18-1, 18-2. And Diggs (via his nickname, "Bias") is mentioned in McClellan's texts as being involved in planning the robbery. In January 2017, following several texts in which McClellan and Johnny discussed "going to check the spots out," "go[ing] a nice distance," and having "something super sweet for us on some big money shit," Johnny texted McClellan that he "talk to bias he supposed to be getting down." Doc. 280 at 68-75; Gov't Exh. 9-3 at 5-13. A week later, McClellan asked Johnny, "Did u let bias know we good on dat?" Doc. 280 at 77; Gov't Exh. 9-13 at 15. And when McClellan and Johnny were getting ready to "move out" from Chicago to Atlanta, McClellan texted Johnny that they should "bring bais joint." Doc. 280 at 105; Gov't Exh. 9-5 at 12. Those text messages lend further support for the proposition that Diggs participated in planning, committing, and trying to sell the proceeds of the robbery.

In light of the forceful evidence against Diggs, it is beyond dispute that, "viewing the evidence in the light most favorable to the prosecution, [a] rational trier of fact could have found him guilty beyond a reasonable doubt." *Warren*, 593 F.3d at 546. Diggs's motion for acquittal accordingly is denied.

### B.     McClellan's Motion

Like Diggs, McClellan argues that the evidence introduced at trial was insufficient to prove his participation in the robbery beyond a reasonable doubt. Doc. 255. McClellan first contends that the Government was "unable to prove that Mr. McClellan was one of the three men who entered Razny's jewelry store on March 17, 2017." *Id*. at 1. While that is correct, it does not advance McClellan's insufficiency of the evidence claim, as the Government tried McClellan on the theory that he was the getaway driver, not one of the robbers who entered the store. *See United States v. Quintero*, 618 F.3d 746, 754 (7th Cir. 2010) ("[A]ny person that knowingly participates in the escape phase of a [] robbery becomes a principal actor in the robbery."); *United States v. Wilkins*, 659 F.2d 769, 773 (7th Cir. 1981) ("Defendant, if he knowingly participated in the robbery as the getaway driver, is guilty as a principal.").

McClellan next argues that the evidence did not necessarily implicate him in the robbery. He suggests that one of the robbers inside the store could have been the getaway driver; that, according to the cell site location data, his phone could have been as far as six miles away from Razny on the morning of March 17; that his text messages demonstrate only that "certain individuals knew each other"; and that the ring that he sold to W.A. Jewelers might not have been Herman's engagement ring. Doc. 255; Doc. 273. In addition, McClellan notes that there was evidence of other people trying to pawn the jewelry, and that his DNA and fingerprints were found neither on the getaway car nor on the jewelry. Doc. 255.

As a preliminary matter, McClellan's characterizations of the weakness of the text message, cell site location data, and pawning evidence are not supported by the record. The Government introduced deleted text messages from McClellan's phone in which he discussed "going to check the spots out," "go[ing] a nice distance," having "something super sweet for us on some big money shit," "run[ning] through the plan," "tak[ing] sumthin," and meeting with A.P. in Atlanta to "cash out." Doc. 280 at 68-74, 106. Contrary to McClellan's submission, those text messages cannot accurately be characterized as "show[ing] absolutely nothing which would link [him] to the planning of the Razny robbery." Doc. 273 at 1. As to the accuracy of the cell site location data, Special Agent Raschke testified that a cellphone could connect to a cell tower in Hinsdale from at most two miles away, not six miles, Doc. 281 at 125, 130, and that a six-mile connection required specific circumstances that could not occur in Hinsdale, *id*. at 128-130, 159-161. And McClellan's contention that the Government has "never explained" the fact that the returned engagement ring that Herman was wearing at trial lacked two identifying marks disregards Herman's testimony that the marks were present on the ring when it was returned to her after the robbery, Doc. 278 at 227, and that one of the marks had since been "polished out" when the ring was resized and that the other was visible only under magnification, *id*. at 227, 249-250.

More fundamentally, acquittal is appropriate "only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *Presbitero*, 569 F.3d at 704 (7th Cir. 2009) (internal quotation marks omitted). That high bar is not met here. As noted, the text messages from McClellan's phone strongly suggest that he was planning—by "check[ing] [] spots out" and "run[ning] through the plan"— to "take sumthin" from somewhere a "nice distance" away that would allow him to "cash out" on "some big

money." Doc. 280 at 68-74, 106. Cell site location data placed McClellan in Hinsdale at the time of the robbery, traveling from Chicago to Atlanta several days later, and at the Atlanta Microtel—where A.P. the Jeweler testified that he was shown the watches later identified as stolen from Razny—when the 901 phone was there. In addition, McClellan's text messages, sent when McClellan was in Atlanta on March 19, mention meeting with A.P., and records from the Microtel show that McClellan had checked into a room earlier that night. In addition, twelve minutes after calling W.A. Jewelers, McClellan texted Johnny that he "need[ed] that ring." *Id*. at 128. McClellan sold the ring to W.A. Jewelers the next day, as evidenced by the store's video surveillance footage showing a one-legged man entering the store, selling the ring, and leaving; the fact that the sales receipt lists "Joshua McClellan" as the seller's name; and a picture on McClellan's phone, taken that day, with $100 bills spread on his lap. Contrary to McClellan's contentions, Herman convincingly testified that she had identified the ring as her engagement ring, which had been stolen in the robbery, based on the diamond's weight, shape, imperfections, inscription, and serial number.

That evidence is more than sufficient to allow a rational trier of fact, viewing the evidence in the light most favorable to the Government, to have found McClellan guilty beyond a reasonable doubt. *See Warren*, 593 F.3d at 546.

## Conclusion

Defendants' motions for a judgment of acquittal and for a new trial are denied.

March 2, 2022

_____
United States District Judge